JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nathan Sterling Mason, | No. CV-17-08098-PCT-DGC (MHB) |
| Plaintiff, | **ORDER** |
| v. | |
| Charles L Ryan, et al., | |
| Defendants. | |

Plaintiff Nathan Sterling Mason, who is confined in the Arizona State Prison Complex-Lewis, Barchey Unit, in Buckeye, Arizona, brought this pro se civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Director Charles L. Ryan; Correctional Officer Joshua Baese; Corizon, LLC; and Nurse Practitioner (NP) Andreas Thude. (Doc. 46.) Plaintiff alleged Eighth Amendment failure-to-protect and medical care claims. (*Id.*) There are multiple motions pending in this matter, including three separate summary judgment motions, a motion for injunctive relief, and various miscellaneous motions. This Order addresses Ryan and Baese's Motion for Summary Judgment, which relates to the failure-to-protect claims. (Doc. 225.) Mason's Motion for Partial Summary Judgment (Doc. 239), Corizon and Thude's Cross-Motion for Summary Judgment (Doc. 257), and Mason's Motion for Preliminary Injunction (Doc. 303), Motion for Expedited Ruling (Doc. 326), and February 13, 2019 Motion for Court Order (Doc. 329) all concern Mason's medical care claims and will be addressed separately. In this Order, the Court also addresses Mason's January 7, 2019 Motion for Court Order (Doc.

324).[1]  The Court will grant in part and deny in part Ryan and Baese's Motion for Summary Judgment and will deny Mason's Motion for Court Order.

## I.     Background

In Counts One and Two of his First Amended Complaint, Mason set forth Eighth Amendment failure-to-protect claims against Ryan and Baese in their individual capacities. (Doc. 46 at 3.)  Mason alleged that Baese failed to respond reasonably to a known risk of harm to Mason's safety and that Ryan implemented an unconstitutional policy governing protective custody (PC) and that the policy caused Mason injury.  (*Id.* at 3–8.)  Mason alleged that every time he requested PC placement for safety reasons, he was placed "in the hole" and subjected to unconstitutional conditions of confinement, and then he was repeatedly placed back on general population yards where he was subjected to a substantial risk of harm.  (*Id.* at 6–8.)  Mason also asserted an Eighth Amendment claim against Ryan in his official capacity based on the alleged unlawful PC policy.  (*Id.* at 6.)  In Count Three, Mason alleged Eighth Amendment medical care claims against Corizon and Thude for the delay and denial of adequate medical care to treat Mason's spinal/neck injury and chronic pain.  (*Id.* at 9–13.)

Ryan and Baese move for summary judgment as to the failure-to-protect claims in Counts One and Two on the grounds that (1) Baese acted reasonably to a potential threat to Mason's safety, (2) Ryan was not personally involved in any of Mason's PC reviews, (3) the PC policy is constitutional, (4) Mason lacks standing to seek injunctive relief, and (5) Baese is entitled to qualified immunity.  (Doc. 225.)[2]

## II.    Mason's Motion for Court Order

This case is part of the Prisoner Electronic Filing Program.  Mason's documents are filed electronically, and designated prison staff print and deliver to Mason Notices of

---

[1] There are also a number of motions before the Magistrate Judge: Mason's Motion in Limine/Motion to Strike (Doc. 284); Mason's Motion to Appoint an Independent Expert Witness (Doc. 304); Mason's Motion for Sanctions (Doc. 308); and Mason's Motion to Compel (Doc. 310).  These motions will be addressed separately.
[2] The Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Mason of the summary judgment requirements under Federal Rule of Civil Procedure 56.  (Doc. 229.)

Electronic Filing (NEFs) and Orders and documents filed in this case. (*See* Doc. 29, General Order 14-17.) On January 7, 2019, Mason filed his Motion for Court Order, which states that he has been receiving NEFs and Court Orders up to three weeks late, which may cause him to miss filing deadlines. (Doc. 324.) Mason requests that the Court issue an Order directing ADC to deliver NEFs and Court Orders within 48 hours of filing. (*Id.*)

Defendants filed a Response in which they explain that the ADC policy is to deliver NEFs and Court Orders within 48 hours, but the Correctional Officer who normally delivers these filings was on leave for the last two weeks in December 2018, and that Officer's replacement was unable to access the filings. (Doc. 325 at 1–2.) The Response notes that only two Orders were entered in this action during that time frame, both were delivered to Mason upon the Officer's return to work, and neither imposed any deadline or obligation. (*Id.* at 2.) Defendants state that the delay in deliveries was unintentional, steps have been taken to correct the problem, and Mason's ability to litigate this action was not impeded. (*Id.*)

There is no sworn statement attached to Defendants' Response to support the factual contentions. (*See id.*) Specifically, there is no declaration from an ADC official with personal knowledge of the prison's NEF delivery procedure, the reasons for delays, and the prison's response to the problem. Counsel's assertions are not evidence. Nonetheless, in failing to file a reply memorandum in support of his Motion for Court Order, Mason does not refute that the delay in delivery of NEFs was temporary or that the delay in receiving two Court Orders did not cause him to miss any deadlines. Mason has not filed any subsequent notices regarding further problems or delays with deliveries of NEFs and Court Orders. Accordingly, his Motion for Court Order will be denied without prejudice.

Any delays in the delivery of NEFs and Court documents is concerning, and Defendants are reminded of ADC's obligation to comply with General Order 14-17 and its requirements governing service of documents on prisoners.

**III.   Summary Judgment**

    **A.   Governing Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions.

1    *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d

2    454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary

3    judgment if it is based on personal knowledge and sets forth specific facts admissible in

4    evidence).

5          **B.     Evidentiary Issues**

6                **1.     Defendants' Motion for Summary Judgment**

7          In support of their Motion, Defendants cite to the declaration of Marlene Coffey, an

8    Associate Deputy Warden and the PC Administrator. (Doc. 226 ¶ 1, citing Doc. 161, Ex.

9    A, Coffey Decl. ¶ 1 (Doc. 161-1 at 1).) Coffey avers that her declaration is based on her

10   personal knowledge and a review of Mason's PC file and computerized Adult Inmate

11   Management System (AIMS) file. (Doc. 161, Ex. 1, Coffey Decl. ¶ 2.) The PC review

12   process is outlined in Department Order 805, *Protective Custody*, and it requires that for

13   each PC request and review, there must be documentation in the prisoner's AIMS file and

14   numerous PC forms completed at each step in the process. These PC documents are kept

15   in the prisoner's PC file. (*Id.*, Attach. 1, DO §§ 805.02, 1.1.4, 805.04, 1.4.1 (Doc. 161-1

16   at 13, 16).)[3] According to Coffey, Mason requested PC placement and has gone through

17   the PC process seven times since 2010. (*Id.*, Ex. 1, Coffey Decl. ¶¶ 29–33.) But there are

18   no documents from Mason's AIMS file or PC file attached to Coffey's declaration, nor do

19   Defendants cite to where in the record the relevant documents can be found. (*See id.*; Doc.

20   226.)

21         Defendants also cite to the declaration of Baese, who was involved in Mason's PC

22   reviews initiated on December 21 and 23, 2015. (Doc. 226 ¶¶ 47–86, citing Doc. 226, Ex.

23   B, Baese Decl. (Doc. 226-1 at 4).) Baese avers that his declaration is based on his personal

24   knowledge and a review of ADC's records pertaining to Mason. (*Id.*, Ex. B, Baese Decl.

25   ¶ 2.) There are only a few PC forms attached to Baese's declaration. (*See* Doc. 226-1 at

26   _____

27   [3] The forms that must be completed in a PC review include the Information Report form;
     the PC Placement/Review Request form; the PC Inmate Statement form; the Unit
     Administrator PC Review form; the PC Interview Assessment form; the PC Security Initial
28   Interview form; the PC Investigative Summary form; and any additional supporting
     documents such as disciplinary reports and Criminal Investigation Unit reports. (Doc.
     161, Attach. 1, DO §§ 805.04, 1.4.1 (Doc. 69-1 at 45).)

10–17; Doc. 228 at 2, 7.)  Defendants do not cite to where in the record relevant AIMS documentation or the other PC forms may be found.

Defendants' failure to submit the PC documents supporting Coffey and Baese's declarations is troubling because the information provided in those documents relates directly to the elements of Mason's failure-to-protect claim.  More importantly, the Court expressly reminded Defendants that they were required to submit unredacted copies of the relevant PC file documents in support of a summary judgment motion.  (Doc. 167 at 8.)  In failing to attach the relevant documents or otherwise cite to that part of the record where the documents may be found, Defendants fail to comply with Rule 56(c)(1)(A).  Under this Rule, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by[ ] citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "Materials that are not yet in the record—including materials referred to in an affidavit or declaration—must be placed in the record."  Fed. R. Civ. P. 56, advisory comm. note to 2010 amendments.

Courts have routinely held that "that when a party refers to documentary evidence as the source of a factual allegation in an affidavit or declaration, the party must attach the relevant documents to the affidavit or declaration."  *Sapiano v. Millenium Entm't, LLC*, CV 12-8122 PSG (MAN), 2013 WL 12120262, at *4 (C.D. Cal. Nov. 14, 2013) (citing Ninth Circuit cases and district court cases within the Ninth Circuit); *see Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) (upholding the district court's exclusion of affidavits that failed to attached contract documents that were referred to within the affidavits).  Because the party moving for summary judgment must satisfy its initial burden by citing to evidence in the record in support of its factual assertions, the nonmovant's failure to specifically object to a declaration statement or asserted fact is of no moment. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.

The Court will consider only those statements in Coffey and Baese's declarations that are made on personal knowledge or that are properly supported by PC forms and AIMS documentation cited to in the record.

### 2. Mason's Response

Mason argues that Defendants' Motion for Summary Judgment must be denied because Ryan failed to comply with the Court's prior Order directing Defendants to allow Mason access to 18 seized documents and, consequently, he cannot present facts essential to oppose the Motion. (Doc. 236.) Mason supports his Response with a declaration in which he avers that Defendants provided him access to only 8 of the 18 documents, and that Defendants have redacted or altered material information in numerous documents. (*Id.*) In their Reply, Defendants contend that Mason fails to specify in his declaration how any redacted information would preclude summary judgment in this matter. (Doc. 239 at 5.)

Mason's response is construed as a request under Federal Rule of Civil Procedure 56(d) to deny Defendant's Motion. Rule 56(d) provides a device for litigants to avoid summary judgment when they cannot present facts or they require additional time to obtain evidence. The Rule empowers the Court to deny a pending motion for summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. P. 56(d). A Rule 56(d) affidavit or declaration must identify "the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

As set forth below, in failing to submit the relevant PC documents, Defendants fail to demonstrate the absence of a genuine issue of material fact regarding their liability for Eighth Amendment violations. Thus, Mason's Rule 56(d) request to deny summary judgment will be denied as moot.

. . . .

## IV. Relevant Facts[4]

---

[4] In their Reply, Defendants argue that because Mason failed to set forth a separate, opposing statement of facts as required under Local Rule of Civil Procedure 56.1(b), the Court should deem all the asserted facts in their Separate Statement of Facts as admitted and grant summary judgment on this basis. (Doc. 238 at 1–3.) As stated above, the Court can consider only those asserted facts that are properly supported by materials cited to in the record. This requirement applies even if Mason does not dispute an asserted fact. *See*

## A. Protective Custody Review Process

PC status provides housing that is segregated from the general prison population to safeguard prisoners with legitimate protection needs. (Doc. 161-1, Attach. 1, Department Order (DO) 805, *Protective Custody* (Doc. 161-1 at 11).) Under DO 805, the policy governing PC, a request for PC placement initiates a PC review process, which is comprised of seven stages: (1) identification; (2) initial PC review by the Shift Commander; (3) informal review by the Deputy Warden or designee; (4) formal review; (5) recommendation by the Deputy Warden or designee; (6) review and final decision by the PC Administrator or PC Committee; and (7) prisoner appeal and review by the Security Operations Administrator or designee. (Doc. 226 ¶ 9.) Each step of the PC review process is documented. (Doc. 161-1, Attach. 1, DO §§ 805.02, 1.1.4 (Doc. 161-1 at 13).) The policy identifies seven forms that must be completed in each PC review process, and the policy also requires that any other relevant documentation be included in the PC file. (*Id.*, DO §§ 805.04, 1.4.1 (Doc. 161-1 at 16); *see supra* n.3.)

During the first stage—the identification process—a prisoner makes a written or verbal request for PC, and a staff member immediately isolates the prisoner in a safe area and notifies the Shift Commander. (Doc. 161-1, Attach. 1 DO §§ 805.01 1.1, 1.2.) The Shift Commander documents the PC request on an Information Report, and the prisoner completes a PC Inmate Statement to identify information concerning his request. (*Id.*, DO §§ 805.01, 1.3.) The Shift Commander attempts to resolve the prisoner's concerns, which may involve changing cell block or bed assignments, adding prisoners to a Do Not House

Rule 56(c)(1)(A); *Nissan Fire*, 210 F.3d at 1103 (if the party moving for summary judgment does not meet its initial burden of production, the nonmovant need not respond; "[n]o defense to an insufficient showing is required") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970)). Further, because Mason is proceeding pro se, the Court must avoid applying summary judgment rules strictly. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). As mentioned, Mason's verified pleadings and motions must be considered as evidence in opposition to summary judgment. *See Jones*, 393 F.3d at 923. The Court therefore declines to grant summary judgment to Defendants based on Mason's failure to comply with Local Rule 56.1(b), and will consider the facts set forth in Mason's verified pleadings and motions to the extent that they establish disputes with Defendants' asserted facts.

With (DNHW) list, or mediation. (*Id.*, DO §§ 805.01, 1.3.2.) At this stage, prison officials must take steps to protect a prisoner even if the prisoner does not acknowledge that a threat exists. Thus, when officials have information suggesting there may be a threat to a prisoner's safety, the prisoner must be isolated as provided for in this section of DO 805. (*Id.*, DO §§ 805.01, 1.4.)

If there is no resolution, the PC process moves to the second stage—the initial PC review. (*Id.*, DO §§ 805.01, 1.3.2.2.) In this stage, the Shift Commander moves the prisoner to a Detention Unit, immediately refers the prisoner to Mental Health Services for evaluation, and places a hold on the prisoner's AIMS file. (*Id.*, DO §§ 805.02 1.1, 1.1.1, 1.1.2, 1.1.3.) The Shift Commander must document each of these steps in AIMS. (*Id.*, DO §§ 805.02, 1.1.4.) The Shift Commander interviews the prisoner using the PC Security Initial Interview form, and then places the Information Report form, the Inmate Statement form, and the PC Placement/Review Request and PC Security Initial Interview forms with the PC packet and forwards all of the material to the Deputy Warden for the third stage. (*Id.*, DO §§ 805.2 1.1.5, 1.1.6.)

During the third stage—informal review—the Deputy Warden or designee examines the documentation to determine if transfer to another general population location would resolve the issue or if the PC review process needs to continue. (*Id.*, DO §§ 805.03, 1.1.) If it is determined that a complete PC review is required, or if the prisoner is unwilling to agree that movement to another general population yard would resolve the issue, the Deputy Warden documents the reasons on the Unit Administrator PC Review form and forwards all documents to the Correctional Officer IV. (*Id.*, DO §§ 805.03, 1.3.)

In the fourth stage—the formal review—the Correctional Officer IV must track the entire PC process using the PC Tracking forms. (*Id.*, DO §§ 805.04, 1.1.) When a prisoner is formally placed in the PC review process, mental health staff must be notified immediately and the prisoner is evaluated within 24 hours. (*Id.*, DO §§ 805.04 1.2, 1.2.1.) The Correctional Officer IV and the Special Security Unit review the case and gather

pertinent facts to determine if any specific circumstances are present. (*Id.*, DO § 805.04.)[5] The results are documented on the PC Interview Assessment form and the PC Investigative Summary Report, and all information is forwarded to the Deputy Warden or designee for review and evaluation. (*Id.*, DO §§ 805.04, 1.4.)

If at any time the prisoner requests to terminate the PC process and return to the unit, a PC Inmate Statement form must be completed, the Deputy Warden or designee must review the prisoner's request and determine if the prisoner should return to the unit, and, if the prisoner can return, the Deputy Warden must ensure the PC Inmate Statement form and the Unit Administrator PC Review form are completed and placed in the PC file. (*Id.*, DO §§ 805.04, 1.8.)

The fifth stage involves the Deputy Warden's recommendation for PC placement, alternative placement to another unit, or denial. (*Id.*, DO §§ 805.04, 1.4–1.5.1.) This recommendation is made on the PC Decision Worksheet and PC Placement Review Request form, which are then forwarded to the PC Administrator or PC Committee for review. (*Id.*, DO §§ 805.05, 1.1.)

During the sixth stage of the PC process—review and final decision—the case is reviewed, and a final decision is made by the PC Administrator or the PC Committee. (*Id.*, DO §§ 805.06 1.2, 1.2.2.) If this decision is different from the Deputy Warden's recommendation, there must be a written explanation for the decision. (*Id.*, DO §§ 805.06, 1.3.)[6]

---

[5] The policy identifies the following specific circumstances that must be considered: record of being physically assaulted; reputation of being an informant or trial witness; record of being threatened, verbally abused, or harassed; record of being sexually assaulted or harassed; threats by a gang; former criminal justice officials; convicted of a crime repugnant to the prison population; physical size, build, or age; identified as gay or transgender; unspecified or generalized threat or fear or repeated PC requests; an incident that triggered the request; identification of prisoners who assaulted or threatened the prisoner requesting PC; specific noticeable marks consistent with an altercation; when and where an altercation occurred; medical treatment offered; photographs of injury or weapon; and any other relevant information. (Doc. 161-1, Attach. 1, DO §§ 805.04, 1.3.1.1–1.3.1.17.)

[6] Defendants assert that the final decision is made not by a single individual, but by the PC Committee (Doc. 226 ¶ 24). But the PC policy expressly states that the PC Administrator *or* the PC Committee shall make the final decision. (Doc. 161-1, Attach. 1, DO §§ 805.06, 1.2, 1.2.2.)

The PC process ends here, unless the prisoner pursues an appeal—the seventh stage. A prisoner may appeal the decision to the Security Operations Administrator, who makes the final decision on the appeal. (*Id.*, DO §§ 805.07, 1.1–1.2)

**B.    Mason's PC Requests**

Mason first requested PC placement on November 20, 2010. (Doc. 46 at 3.) Mason avers that upon his request, he was put into administrative segregation. (*Id.* at 6.) While in administrative segregation, his telephone calls and commissary privileges were restricted and he was denied contact visits. (*Id.*) Also, his recreation opportunities were limited to a cage with no access to equipment, and he was barred from participating in programming, education classes, and religious services. (*Id.*) Mason further avers that he was subjected to property restrictions while in administrative segregation, and he was barred from any employment. (*Id.*) There are no PC forms or any documentation in the record related to this November 2010 PC request and the subsequent PC review. Mason's request for PC was denied, and he was transferred to a different yard. (*Id.* at 3, 5.)

Mason's second PC request was made on April 20, 2011. (*Id.*) Mason was again placed in administration segregation with the above restrictions. (*Id.* at 6.) There are no PC forms or any documentation in the record related to this PC request and the subsequent PC review. The PC request was denied, and Mason was transferred to a different yard. (*Id.* at 3, 5.)

Mason's third PC request was made on July 3, 2011. (*Id.*) Mason was placed into administrative segregation with the attendant restrictions. (*Id.* at 6.) There are no PC forms or any documentation in the record related to this PC request and the subsequent PC review. The PC request was denied, and Mason was transferred to a different yard. (*Id.* at 3, 5.)

Mason made a fourth request for PC placement on September 19, 2011. (*Id.*) He was placed in administrative segregation with the attendant restrictions. (*Id.* at 6.) There are no PC forms or any documentation in the record related to this PC request and the subsequent PC review. The PC request was denied, and Mason was transferred to a different yard. (*Id.* at 3, 5.)

The time Mason spent in administrative segregation after each PC request amounted to more than a year. (Doc. 46 at 3, 5–6.) Mason avers that after one of his PC requests, Special Security Unit Staff, Associate Deputy Warden Bowman, and Correctional Officer IV Morales all recommended PC placement, but the PC Administrator denied PC and Mason was sent to another yard. (*Id.* at 5.)

Mason made another PC request sometime in 2015, and this request was also denied. (Doc. 226-1 at 17; Doc. 46 at 4.)[7]

On December 21, 2015, while Mason was housed in the Kaibab Unit, a prison employee discovered an anonymous note in the Kaibab mailbox stating:

> Mason's brother has told on the hood an[d] now if I don't stab and kill him I will be killed myself[.] Please get him off the yard so I don't have to[.] They know his brother is in PC and can't be touched[.] This is not a joke just check it out.

(Doc. 226 ¶¶ 48–49.) This note was given to Baese to review and investigate. (*Id.* ¶ 56.) That same day, Baese isolated and interviewed Mason, and, during the interview, learned of Mason's prior requests for protection. (Doc. 46 at 3; Doc. 226-1 at 6, Baese Decl. ¶¶ 15–17.) Mason was given the option to request PC, but he would have to endure indefinite time in detention pending the PC review. (Doc. 46 at 4.) Because he did not want to spend another six months in "the hole" with restrictions, and in light of the denials of every prior PC request, Mason felt that any further PC request would be handled the same way and be denied. (*Id.* at 4–5.) Mason therefore completed and signed a PC Inmate Statement form, in which he wrote that he had no issues at the Winslow Complex or the Kaibab Unit, that he did not fear for his safety, and that he wanted to stay in general population at the Winslow Complex. (Doc. 226-1 at 13.) He added that "if someone attempts to take my

---

[7] Defendants assert that Mason made a PC request on July 13, 2015, but they fail to cite to any competent evidence documenting it. (Doc. 226 ¶ 38.) In a PC Inmate Statement form completed in December 2015, Mason wrote that he had requested PC five times before he did so again in December 2015, and in his First Amended Complaint, Mason indicated that he had requested PC at least five times before his December 2015 request. (Doc. 226-1 at 17; Doc. 46 at 4.) Thus, although there are no forms or documents pertaining to a July 2015 PC request in the record, the parties do not dispute that there were at least five PC requests and denials prior to December 2015.

life I will do the same to them." (*Id.*)

Baese then completed an Information Report form dated December 21, 2015, which documented that the anonymous letter referenced Mason and a threat against him based on his brother giving up information regarding the Security Threat Group (STG) Aryan Brotherhood at another unit. (Doc. 228, Attach. 3 (Doc. 228 at 2).) Baese wrote that he interviewed Mason and obtained a written statement that, despite this information, Mason wanted to stay on the Kaibab Unit. (*Id.*) On this same Information Report form, in the section titled "Comments/Action Taken," it is documented that "I/M [inmate Mason] placed in DO 805 process." (*Id.*)[8]

The next day, December 22, 2015, Baese and another officer conducted a search of Mason's cell and found a weapon made from a four-inch piece of steel with a sharpened point. (Doc. 226-1, Baese Decl. ¶¶ 30–32; Doc. 228 at 5.) The weapon was seized and Mason was charged with felony weapon possession. (Doc. 226, Baese Decl. ¶¶ 34–35; Doc. 228 at 4–5.)

Later on December 22, 2015, Mason was assaulted by two prisoners who did not live in Mason's pod. (Doc. 46 at 3.) Mason suffered a spine injury, which has caused chronic, debilitating pain and loss of mobility. (*Id.* at 3–4.)

The next day, December 23, 2015, Baese conducted a follow-up interview with Mason. (Doc. 226-1, Baese Decl. ¶ 37; Doc. 228 at 7.) Mason informed Baese that he had been assaulted because of his brother's bad standing with the Aryan Brotherhood. (*Id.*) Baese observed superficial marks on Mason that were consistent with a physical altercation, but he did not observe significant injuries. (Doc. 226-1, Baese Decl. ¶ 42.) Mason completed and signed a PC Inmate Statement form, dated December 23, 2015, which stated that he had been warned of a letter that said his life was in danger, but that because he had previously requested PC five times and was denied, he signed a PC waiver to go back to the yard where he immediately manufactured a knife to protect himself. (Doc.

---

[8] Defendants do not explain why this PC form states that Mason was placed in the DO 805 process even though he was returned to the Unit and, according to Defendants, no DO 805 review process was initiated. (*See* Doc. 228 at 2; Doc. ¶¶ 70–71.)

226-1 at 17.)  Mason wrote that he was jumped by prisoners the next day.  (*Id.*)  He wrote that he has five Aryan Brotherhood members on his DNHW list, that his brother is in PC, and that he fears for his life after being assaulted and is therefore requesting PC.  (*Id.*)

Baese completed an Information Report form, dated December 23, 2015, which documented Mason's claim that he was assaulted and his request for protection and to get off the yard.  (Doc. 228 at 7.)  In the section of the form titled "Comments/Action Taken," Baese wrote "full review."  (*Id.*)  There are no other PC forms related to the December 23, 2015 PC review in the record, but the PC request was later denied.  (*See* Doc. 46 at 3.)

Mason requested PC again on March 4, 2016.  (*Id.*)  There are no PC forms or any documentation in the record related to this request and the subsequent PC review.

## V.    Discussion

### A.    Eighth Amendment Standard

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners because "being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer*, 511 U.S. at 833–34; *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009).  To prevail on a failure-to-protect claim, a plaintiff must present facts that satisfy a two-part test: (1) that the alleged deprivation is, objectively, sufficiently serious, and (2) that the official is, subjectively, deliberately indifferent to the inmate's safety.  *Id.* at 834.  Thus, there is an objective and subjective component to an actionable Eighth Amendment violation.  *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

Under the objective prong, "[w]hat is necessary to show sufficient harm for the purposes of the Cruel and Unusual Punishment Clause depends on the claim at issue."  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  For a failure to protect claim, the prisoner must show that he was placed into conditions that posed a substantial risk of serious harm.  *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  A prisoner need not wait until he is actually assaulted to bring an Eighth Amendment claim, *see Farmer*, 511 U.S. at 845, but "[g]eneral intimidation, harassment, and nonspecific threats

. . . do not demonstrate a constitutionally intolerable risk of harm." *Chandler v. Amsberry*, No. 3:08-CV-00962-SI, 2014 WL 1323048, at *7 (D. Or. March 28, 2014) (citing cases).

The subjective prong requires "more than ordinary lack of due care for the prisoner's interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted). To prove deliberate indifference, a plaintiff must show that the official knew of and disregarded an excessive risk to inmate safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. *Id.* at 837. But the plaintiff need not show that the defendant acted or failed to act believing that harm would actually befall the inmate. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. To prove knowledge of the risk, the plaintiff may rely on circumstantial evidence. In fact, the very obviousness of the risk may be sufficient to establish knowledge. *Id.*

Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844. Prison officials do not escape liability, however, if the evidence shows that that they "merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Id.* at 843 n.8.

## B. Defendant Baese

### 1. Objective Prong

Defendants do not present any argument regarding the objective prong. Instead, they acknowledge that Baese treated the anonymous letter about Mason as a legitimate threat. (Doc. 225 at 11.) In addition to the letter showing a specific threat to Mason, the record indicates that there were other circumstances present that are identified in DO 805 policy as relevant to the PC consideration. Specifically, Mason's brother had a reputation as an informant, Mason had a record of being threatened as evidenced by his DNHW list, the threats came from a verified STG, and Mason had repeated PC requests denied. (Doc. 161-1, DO §§ 805.04, 1.3.1.2, 1.3.1.3, 1.3.1.5, 1.3.1.10.) At the least, there is a question of fact whether Mason was exposed to a substantial risk of serious harm in general population in December 2015.

### 2. Subjective Prong

The initial inquiry in the deliberate indifference analysis is whether Baese was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Farmer*, 511 U.S. at 837. Baese states in his declaration that he received the anonymous note threatening Mason; that such notes are taken seriously; and that as part of his investigation into the threat, he reviewed Mason's PC file and was aware of Mason's prior PC requests and that Mason had received alternate placement to remove him from risks at other units. (Doc. 226-1, Baese Decl. ¶¶ 3, 9, 11, 15–16.) This evidence demonstrates that Baese was aware of the substantial risk of serious harm to Mason.

Next, the Court considers Baese's response to the risk of substantial harm. *Farmer*, 511 U.S. at 837. Defendants argue that Baese acted reasonably because he treated the note seriously, he reviewed Mason's PC file, he isolated and interviewed Mason, and he afforded Mason the opportunity to request PC and be immediately placed in protective detention. (Doc. 225 at 11.) Defendants contend that DO 805 does not provide for involuntary PC, that the prisoner must initiate the PC process, and that Baese acted reasonably because he gave Mason the opportunity to request PC in light of the anonymous

threat against him.  (Doc. 225 at 11.)  But Defendants' contention conflicts with that portion of DO 805 directing prison officials to act to protect a prisoner even when the prisoner does not acknowledge that a threat exists.  (Doc. 161-1, Attach. 1, DO §§ 805.01, 1.4.)  In such circumstances, when a prison official "has information suggesting there may be a threat to the inmate's safety, the inmate shall be isolated as outlined" in the policy.  (*Id.*)  The anonymous note clearly suggested a threat to Mason's safety.  Baese avers that he reviewed Mason's PC file, but because Defendants fail to proffer the PC file, there is a question of fact whether the information it contained, combined with the anonymous note, put Baese on notice of a substantial threat to Mason's safety that required he be isolated and protected even though Mason refused to acknowledge the threat.

Defendants also rely on that portion of DO 805 providing that if at any time a prisoner requests to terminate the PC review process and return to the unit, a PC Inmate Statement form is to be completed.  (*Id.*)  Defendants contend that Mason completed and signed a PC Inmate Statement confirming he wanted to stay in general population and did not fear for his safety, and that Baese therefore acted reasonably when he left Mason in general population.  (*Id.*)  The relevant section of DO 805 specifically states that if a prisoner seeks to terminate the PC review process he must complete a PC Inmate Statement and the Deputy Warden or designee makes the decision whether to return the prisoner to the unit.  (Doc. 161-1, Attach. 1, DO §§ 805.04, 1.8 (Doc. 161-1 at 17).)  Upon the Deputy Warden's decision to return the prisoner to the unit, both the PC Inmate Statement form and the Unit Administrator PC Review form must be entered into the PC file.  (*Id.*)  Here, there is no evidence or even a claim that Baese, who was a Special Security Unit Correctional Officer II, was acting as the Deputy Warden's designee when he made the decision to return Mason to general population and to terminate the PC review process. (*See* Doc. 226-1 at 4, Baese Decl. ¶ 1.)  Also, Defendants do not submit the PC file or, specifically, the Unit Administrator PC Review form that was required to be completed and placed in the PC file when the decision was made to return Mason to the Unit.

On this limited record, there are genuine issues of material fact whether Baese acted

reasonably when he refused to protect Mason despite the threat to Mason's safety, and whether he acted reasonably when he terminated the PC process and returned Mason to general population without a decision by the Deputy Warden and proper documentation from the Unit Administrator.

### 3. Qualified Immunity

Defendants assert that Baese is entitled to qualified immunity. (Doc. 225 at 17.) Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case). In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly

established.  *See id.* at 1117–18.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted).  "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'"  *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011) (quoting *Hope*, 536 U.S. at 741).

Here, the Court has already determined that there are triable issues of fact whether Baese violated Mason's Eighth Amendment rights.  Qualified immunity therefore turns on the second prong—whether the right at issue was clearly established such that Baese would have known that his conduct was unlawful.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Defendants do not present any argument going to this second prong.  Instead, they assert that Baese is entitled to qualified immunity because he did nothing other than follow the procedures set forth in the DO 805 policy, he had no notice that his actions were unconstitutional, and it was reasonable for him to conclude that his actions complied with the policy and the law.  (Doc. 225 at 17.)  As discussed, there is a question of fact whether Baese's decision not to protect Mason and to return Mason to general population complied with the DO 805 policy.  Due to Defendants' failure to submit Mason's PC file, the evidence is insufficient to support that Baese responded reasonably to a threat to Mason's safety.

Moreover, as early as 1994, it was clearly established that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," and that prison officials violate the Eighth Amendment when they disregard a known risk to an inmate's safety.  *Farmer*, 511 U.S. at 833–34.  Since 1996, the Ninth Circuit held that "prison officials' duty to take reasonable measures to protect inmates from violence at the hands of other prisoners was clearly established" and that failure to respond to a known, credible threat to a prisoner's safety violates the prisoner's Eighth Amendment rights.  *Robinson v. Prunty*, 249 F.3d 862, 866 (9th Cir. 2001); *see Berg v. Kincheloe*, 794 F.2d 457, 460–61

(9th Cir. 1986.)

In short, Defendants fail to establish that Baese is entitled to qualified immunity, and summary judgment will be denied as to the claim against Baese.

**C.    Ryan**

**1.    Supervisory Liability**

A supervisor may be liable in his individual capacity under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202 (9th Cir 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  Supervisory liability is direct liability, which requires the plaintiff to show that the supervisor breached a duty to the plaintiff that was the proximate cause of his injury.  *Redman v. Warden of San Diego*, 942 F.2d 1435, 1447 (9th Cir.1991) (en banc), *abrogated on other grounds by Farmer*, 511 U.S. at 834 (citation omitted).  "The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right."  *Id.* (internal quotation marks omitted).  A causal connection can be "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct." *Rizzo v. Goode*, 423 U.S. 362, 371 (1976). In other words, a supervisor can be liable for creating policies and procedures that violated a plaintiff's constitutional rights.  *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012). The "sufficient causal connection" may be shown by evidence that the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights[.]'"  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted).  This type of claim against a supervisor does not fail on a state of mind requirement such as intent, knowledge, or deliberate indifference.   "Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately causes the harm—

that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

## 2. Analysis

Defendants argue that Mason fails to state a claim against Ryan; that Ryan cannot be liable because he does not have any personal involvement with the PC process; and that Mason's claim arises out of an alleged assault that occurred only after he refused to participate in the PC review process in December 2015, showing that the PC policy did not cause an injury. (*Id.* at 12–13.) These arguments are unavailing. The Court already determined at screening that Mason sufficiently stated an Eighth Amendment claim against Ryan in his individual capacity. (Doc. 47.) And overt personal participation in the PC process is not required for supervisory liability under § 1983. *Redman*, 942 F.2d at 1446 (overt personal participation not required for supervisor liability).

In arguing that Mason's claim arises solely out of the events in December 2015, and that Mason's claims stemming from earlier PC requests are time barred, Defendants misconstrue the claim against Ryan. (Doc. 225 at 13–14, citing *Hai Van Le v. Ariz. Dep't of Corr.*, No CV 11-0744-PHX-RCB (ECV), 2013 WL 4874453 (D. Ariz. Sept. 12, 2013).) In his First Amended Complaint, Mason did not allege a separate Eighth Amendment claim for each instance he was denied PC placement. (*See* Doc. 46 at 3, 6.) *Cf. Hai Van Le*, 2013 WL 4874453, at *8 (finding that the plaintiff's claims challenging the 2005, 2006, and 2007 PC determinations were time barred). Rather, Mason alleged that Ryan implemented a policy—DO 805—that violated his constitutional rights in two ways: (1) it required Mason to house in detention where he was subjected to unlawful conditions of confinement, and (2) despite evidence of threats against Mason, application of the PC policy resulted in repeated denials of PC placement and transfers to general population yards where Mason continually faced a risk of substantial harm. (Doc. 46 at 3–8.) As stated, a supervisor may be liable if he implements a policy so deficient that it inflicts constitutional injury. *Hanson*, 855 F.2d at 646.[9]

---

[9] The claims in *Hai Van Le*, on which Defendants rely, were not based on supervisory or direct liability for implementation of a deficient policy. *See* 2013 WL 4874453, at *8.

Defendants maintain that Ryan is not liable for consequences of the DO 805 policy because he delegated the responsibilities of the policy to the PC Committee. (Doc. 225 at 12; Doc. 226-1, Ryan Decl. ¶ 4.) Under state law, however, Ryan is responsible for ADC policies, which would include the DO 805 policy. *See* Ariz. Rev. Stat. § 41-1604(A)(1). In delegating his responsibilities to subordinates, Ryan retained a duty to ensure that those to whom he delegated responsibility for PC reviews performed the reviews appropriately. *See Estate of Gonzales v. Hickman*, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *9 n.55 (C.D. Cal. May 30, 2007) ("a supervisor cannot take solace from the mere fact that he had delegated responsibility for the challenged action to lower echelon employees") (quoting *Lupo v. Voinovich*, 235 F. Supp. 2d 782, 794 (S.D. Ohio 2002)); *see* Ariz. Rev. Stat. § 41-1604(B)(1)(d) (the director may delegate functions or duties "that the director believes can be competently, efficiently and properly performed"). Because Defendants fail to submit Mason's PC file, there is no competent evidence to show that Mason's PC reviews were performed appropriately and competently. Consequently, there are genuine issues of material fact whether Ryan properly delegated his responsibilities under the DO 805 policy and whether Ryan breached his duty to Mason. *See Redman*, 942 F.2d at 1446–48 (triable issue of fact whether sheriff, who was "required by statute to take charge of and keep the county jail and the prisoners in it," was liable as a supervisor under § 1983 for acquiescing in a deficient policy that was moving force behind the plaintiff's constitutional injury); *see also Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 80–81 (6th Cir. 1995) (material factual dispute whether defendant warden properly discharged his duty to review and approve all transfers and ensure safety of vulnerable inmates).

On its face, the DO 805 policy appears lawful. Mason alleges, however, that his PC requests were repeatedly denied without any legitimate basis and contrary to recommendations for PC placement, and despite policy provisions that require documentation and consideration of particular circumstances that indicate a risk to a prisoner's safety and that require a formal recommendation by the Deputy Warden. (*See* Doc. 46 at 5, 7–8; Doc. 161-1, Attach. DO §§ 805.04, 1.3.1, 805.05.) Mason claims that,

in practice, the PC policy reviews were inadequate and mishandled and, as a result, he was repeatedly forced back onto general populations yards where he was subject to a substantial risk of harm and feared for his life, and where he was ultimately attacked and seriously injured by other prisoners. (Doc. 46 at 3–8.) *See Baze v. Rees*, 553 U.S. 35, 50 (2008) ("subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment"). Because Defendants fail to submit the PC file, there is a material factual dispute whether the PC policy reviews were inadequate and improper and whether Mason suffered a constitutional injury pursuant to the DO 805 policy for which Ryan was responsible. *See OSU Student Alliance*, 699 F.3d at 1076.

Mason also alleges that, pursuant to the DO 805 policy, upon each request for PC placement, he was forced into detention, exposed to unconstitutional conditions of confinement, and subjected to these conditions for significant periods of time. (Doc. 46 at 3–8.) He states that he spent over a year in administrative segregation, where he was locked down 24 hours a day, except for 6 hours a week for exercise inside a cage; he was denied contact visits, religious programming and services, and work opportunities; and he was subjected to telephone, property, and commissary restrictions. (*Id.* at 4–6.) According to Mason, each time he was moved to a general population yard he was forced to choose between requesting PC placement and suffering unconstitutional conditions of confinement or staying on the yard and facing a substantial risk of harm from other prisoners. (*Id.* at 7–8.)

Defendants argue that prisoners in the PC review process are transferred to the detention units for their own protection, and that this type of administrative segregation— even when restrictive—is not unconstitutional. (Doc. 225 at 13–14.)[10] Defendants submit no competent evidence to refute that the conditions in detention were as Mason describes. But they maintain that none of the alleged conditions or restrictions deprived Mason of the minimal civilized measure of life's necessities. (*Id.* at 15.)

---

[10] Defendants concede that Mason spent over a year in detention. (Doc. 225 at 14.) They assert that Mason spent a combined total of 436 days in detention over the course of two incarcerations, but they do not submit any documentary evidence to establish the dates of Mason's incarcerations or his days in detention. (Doc. 226 ¶ 33.)

Many of the conditions alleged by Mason concern restrictions, but not complete bans, on certain activities. He claims that he was limited to non-contact visits, but not that he was completely denied visits. (Doc. 46 at 6.) *See Keenan v. Hall*, 83 F.3d a1083, 1092 (9th Cir. 1996) (affirming summary judgment on claims that the plaintiff was denied contact visits with his lawyer and denied visits from persons other than immediate family members). Mason alleges that his telephone calls were limited, but not that he was completely denied telephone access. (*Id.*) *See Keenan*, 83 F.3d at 1092 (affirming summary judgment as to telephone access claim where there were no allegations that denial of telephone access was total or that access was denied for emergency or legal calls). And he alleges that his property and commissary privileges were restricted, but not completely denied, and he was still able to obtain hygiene products. (Doc. 46 at 5.) Thus, even when taking the above allegations as true, they are insufficient to implicate constitutional protections. Mason's allegations regarding the denial of outdoor exercise and access to religious services, however, are more serious.

The Ninth Circuit has stated that "regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (holding that prisoners in long-term and continuous segregation must be provided regular outdoor exercise unless "inclement weather, unusual circumstances, or disciplinary needs" make it impossible). Thus, deprivation of outdoor exercise violates the Eighth Amendment rights of prisoners confined to long-term segregation. *Id.* "Although exercise is 'one of the basic human necessities protected by the Eighth Amendment' . . . a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (twenty-two days insufficient to establish Eighth Amendment violation) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir.1993)). But deprivations of access to outdoor exercise for six weeks or more have been found sufficient to implicate the Eighth Amendment. *See Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (en banc); *Allen v. Sakai*, 48 F.3d 1082, 1087–88 & n.5 (9th Cir 1994) (objective component met where the

plaintiff was segregated for six weeks and permitted out of his cell only weekly for exercise).  In *Keenan v. Hall*, the plaintiff was placed in administrative segregation for six months and he alleged that his exercise was restricted to a 10' by 12' room.  83 F.3d at 1090.  The defendants admitted that the plaintiff's exercise was restricted to an 8' by 21' by 16' space with a roof, three concrete walls, and a fourth wall of perforated steel.  *Id.*  The Ninth Circuit determined that these facts were sufficient to support an Eighth Amendment claim for denial of outdoor exercise.  *Id.* at 1190, 1195 (reversing grant of summary judgment as to the plaintiff's Eighth Amendment exercise claim).

Mason alleges that when he was in administrative segregation for more than a year, his exercise was limited to a "10-foot cage" that lacked any equipment.  (Doc. 46 at 5–6.) These facts are sufficient to support an Eighth Amendment exercise claim.  It follows that because this exercise restriction was part of the detention imposed pursuant to the DO 805 policy, the constitutional deprivation is linked to a policy that Ryan implemented and for which he was responsible.

Summary judgment will be denied as to the claim against Ryan based on his implementation and enforcement of a policy that caused Mason to suffer a constitutional injury.[11]

### D.  Official Capacity Claim Against Ryan

Ryan may be liable in his official capacity for prospective injunctive relief from a continuing or impending state action that violates Mason's constitutional rights if Mason demonstrates that "the entity itself is a 'moving force' behind the deprivation." *Kentucky*

---

[11] A prisoner has a First Amendment right to be free from rules that prohibit his right to free exercise of religion.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  This right can be limited to achieve legitimate correctional goals or to maintain institutional security.  *Id.*  Mason alleges that during his time in detention he was barred from attending religious programs and services.  (Doc. 46 at 6.)  Defendants do not argue that there were legitimate penological reasons for denying Mason access to religious services.  But Defendants do assert that since his incarceration in 2015 Mason has not designated a religious preference and is therefore not eligible to participate in religious programming.  (Doc. 225 at 15, citing Doc. 226 ¶ 95.)  In support, Defendants cite the declaration of Chaplain Stephen Kingsland, who avers that his declaration is based on his personal knowledge and a review of ADC records for Mason.  (Doc. 161-2 at 1, Kingsland Decl. ¶¶ 1–2.)  The Court finds this evidence sufficient to defeat Mason's First Amendment religious exercise claim.

*v. Graham*, 473 U.S. 159, 166 (1985). In this type of claim, 'the entity's policy or custom must have played a part in the violation of federal law.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Graham*, 473 U.S. at 166); *see also Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004). But § 1983 does not authorize an official capacity suit for money damages. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Rather, a plaintiff may seek only prospective relief against a defendant in his official capacity for a "continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Defendants argue that Mason lacks standing to seek injunctive relief as to his failure-to-protect claims because he was approved for PC status and transferred to PC housing in 2016, and there is no continuing violation or immediate threat of injury. (Doc. 225 at 15.) Defendants fail to submit any competent evidence to establish Mason's current housing status. (*See id.*, citing Doc. 226 ¶ 66.) But notably, in his First Amended Complaint, Mason does not request injunctive relief in the form of PC housing. Thus, it appears that he was, in fact, already in PC status when he filed his amended pleading. (Doc. 46 at 14–15.) Instead, Mason requests an injunction ordering that non-ADC personnel process prisoner grievances and that the DO 805 policy be reformed so that prisoners are granted PC status upon request. (*Id.*)[12]

Mason's request concerning the processing of prisoner grievances is unrelated to his Eighth Amendment failure-to-protect claim. The Court cannot issue the requested relief. *See Pac. Radiation Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015) ("[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction").

Mason's request for an order that the DO 805 policy be reformed is construed as a request for declaratory relief. Mason may only maintain an official capacity suit against Ryan to the extent he seeks prospective injunctive relief for an ongoing violation. He

---

[12] Mason's request for an injunction ordering Defendants to provide prescribed medical treatment is related to his medical care claim in Count Three and will be addressed separately. (Doc. 46 at 15.)

cannot maintain such a suit to obtain a declaration that the PC policy violated his rights in the past. *See Puerto Rico Aqueduct v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the exception to Eleventh Amendment immunity "applies only to prospective relief, [it] does not permit judgments against state officers declaring that they violated federal law in the past"). Because he did not request PC housing, and the record indicates that he is already in PC housing, Mason cannot show an ongoing violation related to his failure-to-protect claim. For this reason, and absent any valid request for prospective injunctive relief related to the failure-to-protect claims, Ryan is entitled to summary judgment as to the official capacity claim raised in Counts One and Two.

## VI. Successive Summary Judgment Motion

A district court has discretion to permit successive motions for summary judgment. *Hoffman v. Tonnemacher*, 593 F.3d 908, 911–12 (9th Cir. 2010). A successive summary judgment motion is particularly appropriate when there is an expanded factual record. *Id.* at 911. As set forth above, absent the PC file documents, the factual record is this matter is severely lacking. All the relevant PC file documents were available to Defendants at the time they filed their Motion for Summary Judgment, and, as mentioned, they were reminded of the need to submit these documents in support of a summary judgment motion. (Doc. 167 at 8.) Thus, allowing Defendants to file a second summary judgment motion when they did not succeed after their own failure to submit relevant evidence would give them a second bite at the apple, thereby prejudicing Mason, a pro se prisoner litigant. *See Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) (noting that the value of summary judgment would be diminished if a party could amend the issues to be decided in the same case after that party lost on summary judgment); *Doherty v. Portland Cmty. College*, CV-99-1375-ST, 2000 WL 33200560, at *3 (D. Or. Nov. 15, 2000) (denying the plaintiff's motion for leave to file second summary judgment motion because it "would unduly prejudice [the defendant] and unfairly give [the plaintiff] the proverbial second bite at the apple"). The Court is loath to set a new summary judgment deadline in these circumstances.

At the same time, Mason's PC file would constitute an expanded factual record and could be dispositive of the Eighth Amendment claims in Counts One and Two. At the least, proper summary judgment briefing with the PC file documents will serve to flesh out the relevant facts and narrow the issues prior to trial. The Court will therefore set a new deadline for filing dispositive motions. No extensions to this deadline will be entertained.

The Court previously found Defendants' redactions to PC documents to be improper and concerning. (Doc. 167 at 7.) Defendants are reminded that to satisfy their evidentiary burden on a successive summary judgment motion, they must submit unredacted copies of the PC documents. *See* Fed. R. Civ. P. 56(c)(1)(A). Documentary evidence is to be filed under seal without redactions. Fed. R. Civ. P. 5.2(d). Further, Mason must be permitted to view unredacted copies of any and all documents on which Defendants rely in support of summary judgment. Defendants must make arrangements for Mason to review the documents as needed if he is not permitted to keep them in his cell.

**IT IS ORDERED:**

(1) The reference is withdrawn as to Defendants Ryan and Baese's Motion for Summary Judgment (Doc. 225) and Plaintiff's Motion for Court Order (Doc. 324).

(2) Plaintiff's Motion for Court Order (Doc. 324) is **denied**.

(3) Plaintiff's request under Federal Rule of Civil Procedure 56(d) to deny the Motion for Summary Judgment (within Doc. 236) is **denied**.

(4) Defendants Ryan and Baese's Motion for Summary Judgment (Doc. 225) is **granted in part** and **denied in part** as follows:

(a) the Motion is **granted** as to the official capacity claim against Ryan in Counts One and Two; and

(b) the Motion is otherwise **denied**.

(5) Within **45 days** from the date of this Order, the parties may file new summary judgment motions as to the remaining individual capacity claims against Ryan and Baese in Counts One and Two. Absent extraordinary circumstances, no extensions to this deadline will be permitted.

(6)     Protective custody documents must be filed under seal without redaction.

Dated this 4th day of March, 2019.

David G. Campbell
Senior United States District Judge