**WO**

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

|  |  |
|---|---|
| Nathan Sterling Mason, | No.  CV 17-08098-PCT-DGC (MHB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Nathan Sterling Mason, who is confined in the Arizona State Prison Complex-Lewis, Buckley Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Director Charles L. Ryan; Correctional Officer Joshua Baese; Corizon, LLC; and Nurse Practitioner (NP) Andreas Thude. (Doc. 46.)  Plaintiff alleged Eighth Amendment failure-to-protect claims (Counts One and Two) and medical care claims (Count Three). (*Id.*)  Before the Court are multiple motions related to Mason's medical care claims against Corizon and Thude:

- · Mason's Motion for Partial Summary Judgment as to Corizon (Doc. 239);
- · Corizon and Thude's Cross-Motion for Summary Judgment (Doc. 257);
- · Mason's Motion for Preliminary Injunction (Doc. 303);
- · Mason's Motion to Compel (Doc. 310);
- · Mason's Motion for Expedited Ruling (Doc. 326); and
- · Mason's Motion for Court Order (Doc. 329).[1]

---

[1] There are also several motions before the Magistrate Judge: Mason's Motion in

The Court will deny Plaintiff's Motion for Partial Summary Judgment, deny Corizon and Thude's Cross-Motion, and deny Mason's Motion to Compel. The remaining medical-care related motions will be addressed in a separate order.

## I. Background

In Count Three of his First Amended Complaint, Mason alleged that in December 2015, he suffered a neck injury that caused his C5-C6 discs to bulge through his spinal canal. (Doc. 46 at 9.) Mason claimed that his injury causes extreme, chronic pain; numbness in his hand, neck and shoulder; pain in his neck, shoulder, and arm; and he has developed ulcers from the ibuprofen medication prescribed for pain. (*Id.*) According to Mason, Corizon and Thude have refused to provide specialist-prescribed treatment for his injury and severe pain. (*Id.* at 9–13.) Mason sued for injunctive relief and damages. (*Id.* at 14–15.)

Mason moves for partial summary judgment against Corizon, arguing that Corizon's policies and practices resulted in unconstitutional medical care, including the denial of specialist-recommended treatment for Mason's serious medical needs. (Doc. 239.)

Corizon and Thude cross-move for summary judgment on the grounds that there is no evidence of deliberate indifference to Mason's serious medical needs and there is no evidence that Mason suffered harm. (Doc. 257.)[2]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying

Limine/Motion to Strike (Doc. 284); Mason's Motion to Appoint an Independent Expert Witness (Doc. 304); Mason's Motion for Sanctions (Doc. 308); Mason's Motion to Amend Complaint (Doc. 340); and Mason's Motion for Hearing (Doc. 343). These Motions will be addressed separately.

[2] The Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Mason of the summary judgment requirements under Federal Rule of Civil Procedure 56. (Doc. 267.)

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

Finally, where the plaintiff seeks injunctive relief, the court may also consider developments that postdate the motions to determine whether an injunction is warranted.

*Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

**III.    Motion to Compel**

A district court is required to determine the merits of the nonmovant's pending discovery motions before ruling on summary judgment motions. *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1178–79 (9th Cir. 2006); *see Garrett v. City & Cnty. of S.F.*, 818 F.2d 1515, 1519 (9th Cir. 1987). "[S]ummary judgment is disfavored where relevant evidence remains to be discovered, particularly in cases involving confined pro se plaintiffs." *Jones*, 393 F.3d at 930 (citing *Klingele v. Eikenberry*, 849 F.2d 409, 412 (9th Cir. 1988)). Thus, summary judgment is not appropriate when there are outstanding requests for additional discovery unless such discovery "would be 'fruitless' with respect to the proof of a viable claim." *Id.*

On December 13, 2018, Mason filed a Motion to Compel seeking relevant medical records from Corizon. (Doc. 310.) Mason states that he entered an agreement with defense counsel to extend discovery deadlines in return for defense counsel timely providing offsite medical care records and Corizon Utilization Management records related to Mason's treatment. (*Id.*) Mason submits that these records have not been produced. (*Id.*) In Response, Corizon confirms that defense counsel agreed to provide Mason with his offsite specialist reports and Corizon Utilization Management records, and it maintains that it has done so. (Doc. 310 at 4.) According to Corizon, it provided Mason with his pertinent medical records when it filed its Cross-Motion for Summary Judgment with over 600 pages of medical records attached. (*Id.* at 2.) Corizon further argues that Mason's Motion to Compel is untimely and procedurally improper. (*Id.* at 2–5.)

As set forth in the summary judgment analysis below, offsite specialist medical records and Corizon Utilization Management records are missing from the record. Nonetheless, the absence of these records does not prejudice Mason at this stage because even without these records, there exist disputed material facts precluding summary judgment for Defendants. The Motion to Compel will therefore be denied without prejudice to refiling post-summary judgment.

## IV.    Objections

Defendants object to all of Mason's "alleged facts" in his Statement of Facts "that do not cite to any supporting materials in the undisputed record." (Doc. 258 at 2.)  But Defendants do not identify any specific paragraphs in Mason's Statement of Facts to which they object.  (*See id.*)  The Court will consider only specific objections to identified paragraphs within the Statement of Facts.  *See Reinlasoder v. City of Colstrip*, CV-12-107-BLG, 2013 WL 6048913, at *7 (D. Mont. Nov. 14, 2013) (unpublished) ("objections [ ] must be stated with enough particularity to permit the Court to rule"); *see also Halebian v. Berv*, 869 F. Supp. 2d 420, 443 n.24 (S.D. N.Y. 2012) (a court is not obligated to consider an objection entirely lacking in particularity).

Defendants also appear to object to Mason's declarations; they argue the declarations are insufficient because they are comprised of self-serving and conclusory statements.  (Doc. 258 at 2–3; Doc. 309 at 2 & n.1.)  "That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact."  *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999).  As mentioned, at summary judgment, the Court does not make credibility determinations.  *See Soremekun*, 509 F.3d at 984.  Mason's declarations are signed under penalty of perjury, and he has personal knowledge to testify to facts set forth in his sworn statements because they concern his interaction with medical personnel and the treatment he received or did not receive.  (*See* Docs. 73, 306–307.)[3]  Also, Mason has personal knowledge to testify as to his own symptoms and pain.  *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (declarant has personal knowledge of her own symptoms).  The declarations are therefore admissible evidence to the extent the statements therein are based on personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4).  For these reasons, Defendants' objections are overruled.

---

[3] Mason filed a separate declaration verifying the factual allegations in his First Amended Complaint, Motion for Partial Summary Judgment, and Responses to Defendants' Cross-Motion for Summary Judgment.  (Doc. 334; *see* Docs. 46, 239–240, 300–301.)  *See Jones*, 393 F.3d at 923.

Mason objects to Defendants' Separate Statement of Facts on the ground that the asserted facts are supported by medical records obtained in violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). (Doc. 301.) Although Mason has put his medical information at issue in this lawsuit, he does not automatically waive his privacy interest in his protected health information or any required waiver to release of that information. *See, e.g.*, 45 C.F.R. § 164.512(e); *Evans v. Tilton*, No. 1:07-CV-01814, 2010 WL 3745648, at *3 (E.D. Cal. Sept. 16, 2010) (finding "blatant non-compliance" with HIPAA where prison disclosed the plaintiff's medical records without a waiver even though they were directly at issue in the lawsuit). However, Mason's HIPAA-based objection does not challenge the veracity of Defendants' asserted facts, only the manner in which the information was disclosed. In any event, the Court notes that Mason has himself submitted medical records and otherwise relied on Defendants' submission of medical records in support of his claims and requests for injunctive relief. (*See* Doc. 239.) Some of Mason's requests for injunctive relief have been granted in light of the evidence in those medical records. (*See* Doc. 193.) Mason's asserted HIPAA violation is not a basis for granting his objection, even if he may have other remedies for the alleged violation.

Mason also objects to the proffered declaration of Dr. Ladele on the basis that it contains perjury and is not based on personal knowledge. (Doc. 301 at 1–3.) Within his Controverting Statement of Facts, Mason sets forth objections to a majority of Defendants' asserted facts, many of which rely on Ladele's declaration. (*See id.* ¶¶ 5–7, 13–18, 20, 22, 24–29, 31–32, 34–36, 38–47, 49–50, 52–53, 56–62, 72, 78, 80, 83, 85, 90–94, 101–107, 111–113, 115–122, 129–143.) Dr. Ayodeji Ladele is an osteopathic physician employed as Corizon's Regional Medical Director; he is not a specialist and he did not treat Mason, nor is he personally familiar or acquainted with Mason. (Doc. 259, Ex. B, Ladele ¶¶ 2–4 (Doc. 259-1 at 18).) Most of Dr. Ladele's declaration describes Mason's course of treatment, and it is based on a review of Mason's medical records. (*Id.* ¶¶ 4, 6.) Mason's objections to Ladele's declaration and to Defendants' asserted facts stem from his disagreement with Ladele's reading and analyses of portions of the medical records.

- 6 -

Because the Court is able to rely on and cite directly to the relevant medical records, it need not consider the parties conflicting interpretations of the records. Thus, the Court does not consider Ladele's declaration statements that simply recite what is set forth in the medical records. Except for the objections addressed individually below, Mason's objections are unnecessary and overruled.

## V. Relevant Facts

Mason was admitted to ADC custody on April 9, 2015. (Doc. 258, Defs.' Statement of Facts ¶ 1; Doc. 300, Pl.'s Controverting Statement of Facts ¶ 1.) Mason states that in December 2015, he was assaulted, and he began experiencing neck pain. (Doc. 46 at 9.)[4] On January 7, 2016, Mason submitted a Health Needs Request (HNR) stating that he needed to see the provider "ASAP" about his neck. (Doc. 239 at 71.) The HNR response, dated January 8, 2016, stated "refused nursing appt." (*Id.*)

On April 11, 2016, Mason submitted another HNR seeking medical care for his neck; he stated that he injured his neck in 2009 and has taken ibuprofen every day to dull the pain enough to sleep and live, but it is no longer effective, and his stomach cannot take it anymore. (Doc. 259-2 at 16.) Mason requested an MRI. (*Id.*) The next day, April 12, 2016, Mason was seen by a nurse who documented that Mason reported no numbness or tingling, but Mason did report that he suffers constant, daily pain on the left side of his neck, as well as left shoulder pain, and that he cannot sleep on his back due to the pain. (*Id.* at 2, 5.) The nurse referred Mason to a provider. (*Id.* at 7, 9.)

On April 21, 2016, Mason saw NP Lance Burnell; Burnell documented Mason's history of neck problems and that in the past several weeks to months, Mason had increased

---

[4] The parties dispute how Mason initially injured his neck; Mason asserts he was assaulted by two prisoners in December 2015, and Defendants assert that there is no evidence of an assault and that Mason reported that he had neck pain as a result of a 2009 car accident. (Doc. 240, Pl.'s Statement of Facts ¶ 1; Doc. 257, Defs.' Controverting Statement of Facts ¶ 1.) The dispute as to whether Mason's neck injury and pain initiated in December 2015 or was aggravated at that time is not material to his medical care claims. The government is obligated to provide medical care to prisoners and may not be deliberately indifferent to a prisoner's serious medical need, regardless of the cause of an injury or illness. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

symptoms and pain in his neck and left shoulder and experienced numbness almost all the time in his fingers on both hands. (*Id.* at 18.) Burnell prescribed ibuprofen and omeprazole, ordered a cervical spine x-ray, and ordered a follow-up for three weeks later. (*Id.* at 21, 23.)[5] On April 27, 2016, Mason had a cervical spine x-ray performed; the results were normal. (*Id.* at 24.)

Mason was required to submit HNRs to obtain any refills of medication, and he started submitting HNRs requesting ibuprofen refills in April 2016, and continued to do so until approximately April 2018. (*See, e.g.*, Doc. 259-4 at 45, 120, 122; Doc. 259-5 at 80.)[6] Mason disputes that ibuprofen was effective and states that he requested refills because it was the only medication provided to him. (Doc. 301 ¶ 8.)

Meanwhile, on June 3, 2016, Mason submitted an HNR to the Facility Health Administrator (FHA) stating that he was in extreme pain every day and had not received any follow-up after his cervical spine x-rays were performed, and he asked that the FHA please help him. (Doc. 259-4 at 129.) The FHA's response stated that Mason failed to submit an HNR requesting a follow-up for pain and directed Mason to submit HNRs for physical complaints and issues. (*Id.*)

On June 29, 2016, Mason saw NP Carrie Smalley. (Doc. 259-2 at 28.) Mason reported neck and left shoulder pain that started in approximately 2008 and worsened after an altercation in December. (*Id.*) He described the pain as a constant, gnawing, aching pain and he reported difficulty sleeping due to the pain, spasms, and paresthesia in his hands. (*Id.*) NP Smalley examined Mason and assessed cervicalgia, muscle spasm, and

---

[5] Omeprazole is used to treat symptoms of gastroesophageal reflux disease, heartburn, ulcers, and conditions in which the stomach produces too much acid. *See Omeprazole, U.S. Nat'l Library of Medicine*, https://medlineplus.gov/druginfo/meds/a693050.html (last visited March 6, 2019).

[6] Mason objects to Defendants' facts asserting that he submitted HNR requests for ibuprofen refills on the grounds that these facts are not material too his claim and they misstate the facts. (*See* Doc. 301 ¶ 8.) Mason's objection is overruled. The documentary evidence shows that he submitted numerous HNRs for ibuprofen refills, which were processed by the pharmacy, and this evidence is relevant to Mason's treatment. (*See, e.g.*, Doc. 259-4 at 45, 120, 122; Doc. 259-5 at 80.)

paresthesia;[7] prescribed capsaicin topical cream and Flexeril for pain; and ordered labs and a follow-up for one month later. (*Id.* at 29, 31.) Mason was informed that his cervical spine x-ray results were normal, and he was advised to take his medications and to stretch. (*Id.* at 31.)

On August 18, 2016, Mason saw NP Smalley for a follow-up for his neck pain. (*Id.* at 42.) Smalley noted Mason's continued constant, gnawing, aching pain with difficulty sleeping due to pain and intermittent paresthesia to hands, and that Mason had moderate relief with short term muscle relaxants and NSAIDs (nonsteroidal anti-inflammatory drugs). (*Id.*) Mason disputes that he reported moderate relief with ibuprofen; he states that ibuprofen barely worked and was hurting his stomach. (Doc. 301 ¶ 23.) An examination noted tenderness to the neck muscles, pain with flexion and rotation, but no boney tenderness and normal strength. (Doc. 259-2 at 43.) The treatment plan was to submit a consult request for physical therapy, continue with NSAIDs and capsaicin cream, and discontinue omeprazole. (*Id.* at 45.) That same day, a Consultation Request form for off-site clinic physical therapy was submitted. (*Id.* at 47.) The Consultation Request form noted that conservative measures—medications, rest, and stretching—had provided no relief. (*Id.*) The Consultation Request form shows that on August 28, 2016, the request was authorized. (*Id.* at 49.)

On October 13, 2016, Mason attended an off-site physical therapy appointment. (Doc. 259-2 at 51.) The therapist noted that Mason presented with neck pain in the high cervical spine and intermittent finger paresthesia, and that Mason reported the symptoms started in 2015 after an altercation. (*Id.*) Mason exhibited a full range of motion and full strength, but he had muscle spasms and bilateral hand numbness in some fingers. (*Id.*) The therapist documented a plan for three more visits to focus on muscle spasms in the neck

---

[7] Cervicalgia is neck pain described as discomfort or more intense forms of pain that are localized to the cervical region. *See cervicalgia, Nat'l Center for Biotechnology Info. (NCBI)*, https://www.ncbi.nlm.nih.gov/mesh?term=cervicalgia (last visited March 4, 2019). Paresthesia is defined as subjective cutaneous sensations such as tingling, pressure, etc., that are experienced spontaneously without stimulation. *See paresthesia, NCBI*, https://www.ncbi.nlm.nih.gov/mesh/?term=paresthesia (last visited March 4, 2019).

and increasing movement of the high cervical spine. (*Id.*)

A couple of days later, Mason submitted an HNR requesting to see the provider for his neck and stating that the physical therapy was not working. (Doc. 259-4 at 147.) On October 18, 2016, Mason saw a nurse and reported that the medication was not helping his neck pain and that therapy was making it worse and he requested to see a provider. (Doc. 259-2 at 60, 62, 68.) The nurse documented that Mason's neck appeared stiff, but no distress was noted. (*Id.* at 64.) Mason disputes that he was not in distress; he states that he could not move his neck and he was in extreme pain. (Doc. 301 ¶ 32.)

On October 19, 21, and 25, 2016, Mason attended three more offsite physical therapy appointments. (Doc. 259-2 at 71–73.) At the last appointment, Mason reported that he still had pain in his neck and shoulders and that nothing has changed his pain, and the therapist noted that he still had poor range of motion in his mid-to-high cervical spine and numbness in his hands. (*Id.* at 73.)

On October 27, 2016, Mason saw NP Smalley for a follow-up for neck pain. (*Id.* at 75.) The medical note documents that Mason complained that he had suffered neck pain since 2006 and worsening pain since December after an assault. (*Id.*) Smalley noted that Mason had received anti-inflammatories, muscle relaxants, topical creams, and physical therapy "with slight improvement in [range of motion] but worsening of pain." (*Id.*) Mason reported a constant, gnawing ache with shooting pain to his head and shoulder area, intermittent numbness in his hands, and the inability to sleep due to pain. (*Id.*) Smalley prescribed ibuprofen, capsaicin cream, and methocarbamol (muscle relaxant, brand name Robaxin), and she noted that she would submit a request for an MRI. (*Id.* at 77–78.)

On November 16, 2016, NP Smalley submitted an off-site consult request for an MRI. (*Id.* at 89.) The Consultation Request form shows that this request was referred to the Corizon Utilization Management Team the next day, and the request was authorized on November 23, 2016. (*Id.* at 90.)

On November 26, 2016, Mason submitted an HNR stating that his neck pain is "getting worse and worse" and inquiring whether the MRI was approved yet. (Doc. 259-5

at 4.) The HNR response informed Mason that the MRI has been approved and should be scheduled soon. (*Id.*)

On December 16, 2016, Mason had an MRI. (Doc. 259-2 at 101.) The MRI report indicated "multilevel degenerative changes most prominent at C5-6 . . . with severe narrowing of spinal canal and likely early myelomalacia. Spine surgery consultation should be considered." (*Id.* at 102.)[8] The report also noted "mild prominence of Waldeyer's ring[,]" and recommended "[f]ollow-up with CT neck with IV contrast in 1 month or earlier can be performed for further assessment." (*Id.*)[9]

On December 28, 2016, Mason submitted an HNR requesting to see the provider to get his MRI results and to get different medication because his current medication was not working. (Doc. 259-5 at 9.) He reported that his heart felt like it was going to explode, he felt like vomiting, and his vision was blurry sometimes. (*Id.*) On January 3, 2017, Mason was seen by NP Smalley, and Mason reported worsening neck pain that was constant and shooting pain up to his head, increased numbness in hands, and an inability to sleep due to the pain. (*Id.* at 134.) Smalley requested an urgent consult to an orthopedic spine specialist, added the medication nortriptyline for pain, and ordered continued ibuprofen and Robaxin. (*Id.* at 137, 142.)[10] The Consultation Request form shows that the consult request was referred to the Corizon Utilization Management Team for review on January 4, 2017, and, on January 6, 2017, the request was authorized. (*Id.* at 144.)

On January 9, 2017, Mason submitted an HNR stating that his neck symptoms were

---

[8] Myelomalacia is softening of the spinal cord. Stedmans Medical Dictionary 582940 (2014).

[9] Waldeyer's ring is the ring of lymphoid tissue in the throat, made up of the tonsils, adenoids, and other lymphoid tissue. *See Waldeyer's ring, National Institute of Health, National Cancer Institute*, https://www.cancer.gov/publications/dictionaries/ cancer-terms/def/waldeyers-ring (last visited March 6, 2019).

[10] Nortriptyline is in a group of medications called tricyclic antidepressants, and it is used to treat depression. It is also sometimes used to treat panic disorders and neuralgia—the burning, stabbing pains or aches that may last for months or years after a shingles infection—and to help people stop smoking. *See Nortriptyline, U.S. Nat'l Library of Medicine*, https://medlineplus.gov/druginfo/meds/a682620. html (last visited March 6, 2019).

getting worse. (Doc. 259-5 at 13.)

On January 24, 2017, Mason saw orthopedic specialist Dr. Waldrip, who diagnosed Mason with spinal stenosis at C-6 to C-7. (Doc. 259-2 at 153.)[11] Dr. Waldrip's plan was to schedule cervical epidural injections with a pain management specialist. (*Id.*)[12] Mason avers that Dr. Waldrip told him that he had to fail a full course of pain management therapy before Dr. Waldrip could perform surgery. (Doc. 73, Pl. Decl. ¶ 5.)

The next day, January 25, 2017, Mason submitted an HNR requesting a follow-up with a provider. (Doc. 259-5 at 16.). Mason wrote that he saw the orthopedic surgeon, that his current medication has not worked from the beginning, that Dr. Waldrip told him he would be in extreme pain until he has surgery, but that he must try treatment with a pain management specialist before surgery. (*Id.*) Mason saw a nurse that same day; the nurse noted that Mason wanted stronger pain medication until he underwent surgery for chronic neck pain and that the provider would review the chart. (Doc. 259-2 at 174, 176, 179.) At this time, Mason was taking ibuprofen, nortriptyline, capsaicin cream, and methocarbamol. (*Id.* at 178.)

On January 27, 2017, Defendant Thude submitted a consultation request for the off-site pain clinic as recommended by Dr. Waldrip. (*Id.* at 184, 189.) The Consultation Request form shows that the request was referred to the Corizon Utilization Management Team for review. (*Id.* at 190.) The form shows that on February 6, 2017, alternative treatment was recommended instead of the requested off-site pain clinic. (*Id.*) The form documents that on February 9, 2017, there was a discussion with the Corizon "RMD"—

---

[11] Spinal stenosis causes narrowing in the spine; the narrowing puts pressure on the nerves and spinal cord and can cause pain. *See Spinal Stenosis, U.S. Nat'l Library of Medicine*, https://medlineplus.gov/spinalstenosis.html (last visited March 6, 2019).

[12] Dr. Waldrip's diagnosis and plan are noted in the "Consultant Comments" section on a one-page "Consultation Report" form, which sets forth the prisoner's information, the prisoner's ADC number, and the appointment information and authorization number for the appointment. (Doc. 259-2 at 153.) There is no detailed medical record generated by Dr. Waldrip for the January 24, 2017 visit in the record. (*Compare* Doc. 259-3 at 164–166, detailed three-page medical record of a June 15, 2017 appointment with Dr. Waldrip, generated by his office and electronically signed by Dr. Waldrip.)

Regional Medical Director, who Thude states at the time was Dr. Glen Babich. (*Id.*; Doc. 259, Ex. A, Thude Decl. ¶ 8 (Doc. 259-1 at 4).)[13] Thude avers that he discussed the reasoning behind the consult request with Dr. Babich, and the request was then approved. (Doc. 259, Ex. A, Thude Decl. ¶ 8.) The Consultation Request form documents that on February 13, 2017, the consult request authorization was obtained, and the consult was scheduled. (Doc. 259-2 at 190.)

Meanwhile, Mason continued to report to medical staff that the pain medication was not working. (Doc. 259-3 at 1, 13.) On February 1, 2017, Mason saw Thude. (*Id.* at 16.) Mason reported that he had suffered from neck and shoulder pain since December 2015; that all treatments had failed; and that he was unable to sleep due to the pain, which radiated to his left upper back. (*Id.*) Thude noted that Mason had stable vital signs and no apparent distress and that C-2 to C-12 were grossly intact. (*Id.* at 17.) Thude documented that Mason was irritable and spoke with increased volume, scowled and narrowed his eyes at Thude, and said in an elevated voice that he could not "live like this!" (*Id.*) Thude wrote that he reviewed the medication list and verified the consult request for pain management, informed Mason that he would not provide any different pain medication, and then asked an officer to remove Mason from the exam room. (*Id.*) Mason does not dispute that he said in an elevated voice that he could not live like this, but it was only after Thude smiled at him and said, "I'm not giving you any other pain medication." (Doc. 301 ¶ 62.) Mason disputes that he was not in distress at this time; he states that he was in chronic pain and showed signs of pain. (*Id.*)

On February 2, 2017, Thude submitted an offsite consult request for a CT scan of Mason's neck. (Doc. 259-3 at 23, 28.) Thude wrote on the Consultation Request form that

---

[13] Defendants assert that the alternative treatment plan was based on Dr. Babich's "finding that the criteria for an offsite cervical epidural had not been met" and that "Dr. Babich noted that [Mason] needed an updated MRI and neurosurgery referral." (Doc. 259 ¶ 60.) But the materials to which Defendants cite do not support these findings or notes by Dr. Babich. (*See id.*) The Court finds no medical records or notes authored by Dr. Babich or referring to Dr. Babich, nor are there any documented findings related to the criteria for cervical epidurals and need for other referrals.

on December 16, 2016, orthopedics had recommended a CT neck scan within one month. (*Id.* at 28.) The Consultation Request form shows that later that same day, the consult request was "Cancelled REASON: See Comments BY STAFF: Thude, Andreas." (*Id.*) The referenced comments by Thude are not in the record. In his declaration, Thude avers that he had a discussion with Corizon's Site Medical Director Julia Barnett, who recommended an offsite neurology consultation for an electromyogram (EMG) to measure electrical activity and nerve conductions in the neck; therefore, Thude canceled the consult request and issued a new consult request for an offsite EMG. (Doc. 259, Ex. B, Thude Decl. ¶ 15.) There are no medical records documenting this discussion with Dr. Barnett or her recommendations for treatment, nor are there any medical records referring to Dr. Barnett or authored by Dr. Barnett.

Another Consultation Request form was prepared on February 2, 2017, and requested an EMG based on the patient's complaints of neck pain, the MRI results, and a moderate narrowing of the spinal canal. (Doc. 259-3 at 36.) The Consultation Request form shows that the request was referred to the Corizon Utilization Management Team for review, and on February 10, 2017, alternative treatment was recommended instead of the EMG. (*Id.*) The form documented that, as to the alternative treatment recommendation, "REASON: See Comments By STAFF: Johnson, Erica." (*Id.*) The referenced comments by Johnson are not in the record. In his declaration, Thude avers that Dr. Babich reviewed the EMG request and noted that the MRI revealed a cord compression at two levels, so a neurosurgery referral was recommended instead. (Doc. 259, Ex. B, Thude Decl. ¶ 17.) There is no indication on the face of the Consultation Request form that the RMD or Babich was involved in the review or discussed the EMG consult request, nor are there any records of a medical note or findings by Babich or anyone else regarding the reason for a neurosurgery referral. (*See* Doc. 259-3 at 37.)

On February 13, 2017, Thude submitted another Consultation Request form in which he wrote "neuro surgery consult requested per ATP [alternative treatment plan] recommendations[;] MRI shows cord compression at two levels." (Doc. 259-3 at 49, 54.)

The Consultation Request form documents that, later that same day, the consult request was "Cancelled REASON: See Comments BY STAFF: Thude, Andreas." (*Id.* at 55.) A Consultation Request Action form, dated February 13, 2017, shows Thude's comments— "per Labar neuro surgery already reviewed and Marsella (neuro surg) said there was nothing that could be done." (Doc. 259-4 at 46.) "Labar" appears to refer to Dianna Labar, who is identified on other forms as an LPN (licensed practical nurse) and as the AFHA (Associate Facility Health Administer) at the Lewis Complex. (*See* Doc. 259-2 at 49, 144; Doc. 259-3 at 134; Doc. 259-4 at 99.) There are no other medical records or documents that identify or reference a Dr. Marsella or this physician's reviews or findings.

Meanwhile, Mason continued to report ongoing neck pain. (Doc. 259-3 at 41.)

On February 21, 2017, Mason saw Thude again. (*Id.* at 59.) Thude informed Mason that an EMG was not indicated but that he had received a confirmation via email that an epidural steroid injection would be okay. (*Id.*) The email confirming approval for an epidural steroid injection is not in the record. On February 28, 2017, Mason's prescription for methocarbamol was switched to baclofen, another type of muscle relaxant. (*Id.* at 71.)

On February 28, 2017, Mason filed an Inmate Grievance, complaining that he suffered chronic and debilitating pain; he had taken over a thousand ibuprofen yet made numerous complaints of its ineffectiveness; and he had complained of sleep deprivation and been prescribed psychotropic medications and muscle relaxants. (Doc. 259-4 at 94.) Mason wrote that he begged the provider for help to manage his pain, but the provider kicked Mason out of his office. (*Id.*) Mason requested pain medication that provides adequate pain relief. (*Id.*)

On March 7, 2017, Mason refused to take nortriptyline; he stated that nortriptyline caused him to suffer psychotic thoughts and negatively affected his mental health. (Doc. 259-3 at 78; Doc. 302, Mason Decl. ¶ 4; Doc. 306, Mason Supp. Decl. ¶ 5.) The next day, he submitted another Inmate Grievance, stating that he had damage to his spine, that he had lived in chronic pain for 15 months, and that he had not received adequate pain relief and his treatment was being delayed. (Doc. 259-4 at 98.) He requested adequate

pain relief.  (*Id.*)  On March 17, 2017, Mason received the Grievance Response from the FHA, which informed Mason that the treatment plan was to continue with an epidural steroid injection and that Mason was receiving baclofen for pain.  (*Id.* at 95.)

On March 28, 2017, Mason saw pain management specialist Dr. Page at Advanced Pain Management for a new patient consultation and evaluation for cervical radiculopathy.  (Doc. 259-3 at 88.)[14]  Dr. Page's medical record of this encounter documented that Mason's symptoms included neck pain described as a throbbing, dull, aching and shooting pain; numbness; and tingling.  (*Id.*)  The medical record noted that Mason's pain is relieved by nothing and worsened by stress, activity and bending; that pain is severe without pain medication, and with pain medication, pain is moderate; that Mason is able to function with pain medications; that pain impacts his quality of life and daily activities; and that Mason has tried ice, heat, and NSAIDs.  (*Id.* at 88–89.)  Dr. Page took Mason's medical and social history, conducted a thorough examination, which included findings that the cervical spine showed tenderness and did not show full range of motion.  (*Id.* at 88–90.)  Dr. Page diagnosed cervical disc bulge, and then performed a cervical epidural steroid injection (nerve block).  (*Id.* at 90–91.)  Dr. Page's treatment plan included the epidural steroid injection; directions that Mason should follow up in four weeks for a second injection; and he started Mason on the medication Ultram, with directions to take it every 12 hours.  (*Id.* at 91–92.)[15]

On March 28, 2018, after his appointment with Dr. Page, Mason submitted an HNR stating that his medication for pain did not work and made him sick and that Corizon was refusing to provide the pain medication that Dr. Page prescribed.  (Doc. 259-3 at 107.)

---

[14] Cervical radiculopathy is a syndrome of pain and/or sensorimotor deficits due to compression of a cervical nerve root.  *See Cervical Radiculopathy, U.S. Nat'l Library of Medicine, Nat'l Institutes of Health*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3192889/ (last visited March 12, 2019).

[15] Ultram is a brand name for Tramadol, a specific type of narcotic medicine called an opioid that is approved to treat moderate to moderately severe pain in adults.  *See Tramadol Information, U.S. Food & Drug Administration*, https://www.fda.gov/Drugs/DrugSafety/ucm462997.htm (last visited March 12, 2019).

On March 30, 2018, Mason saw a nurse and reported that his pain medication did not work and made him sick. (Doc. 259-3 at 97.) The medical note for this encounter documents that at this time Mason was prescribed baclofen, ibuprofen, nortriptyline, omeprazole, and capsaicin cream; he was not provided Ultram. (*Id.* at 101.) The nurse documented that Mason had seen a pain management specialist a couple of days prior for injections "which don't work," and that the medications baclofen and nortriptyline did not work and made him nauseated. (*Id.* at 99.) Mason avers that he never stated the injections did not work, as Dr. Page had said that the efficacy of the injections would not be known until after a course of three injections was completed. (Doc. 73, Mason Decl. ¶ 7.)

On April 4, 2017, Mason saw Thude; Mason reported that baclofen and nortriptyline were ineffective and causing diarrhea. (Doc. 259-3 at 121.) Thude discontinued the baclofen and nortriptyline, prescribed duloxetine instead,[16] and renewed the capsaicin cream. (*Id.* at 123–124.) Thude also submitted a consult request for the second epidural injection pursuant to the orthopedic surgeon's pain clinic recommendation. (*Id.* at 133.) The Consultation Request form shows that on April 7, 2017, the request was referred to the Corizon Utilization Management Team for review. (*Id.* at 134.) The form shows that on April 13, 2017, an entry was made stating "Need More Information REASON: See Comments BY STAFF: Labar, Dianna, LPN." (*Id.*) The referenced comments by Labar are not in the record. On April 20, 2017, an entry was made on the Consultation Request form stating, "More Information Provided REASON: See Comments BY STAFF: Thude Andreas." (*Id.*) The referenced comments by Thude are not in the record.

Also on April 20, 2017, Thude visited Mason at his cell door to determine Mason's pain level; Mason reported no change in his pain and that it was 10/10 before and after the

---

[16] Duloxetine is in the class of drugs called selective serotonin/norepinephrine reuptake inhibitors, and it is used to treat depression and generalized anxiety disorder. It is also used to treat pain caused by diabetic neuropathy and fibromyalgia, and ongoing bone or muscle pain such as osteoarthritis. *See Duloxetine, U.S. Nat'l Library of Medicine*, https://medlineplus.gov/druginfo/meds/a604030.html (last visited March 12, 2019).

epidural steroid injection.  (*Id.* at 136.)[17]

The Consultation Request form—the same one initiated on April 4, 2017 for the second epidural injection—was then again referred to the Corizon Utilization Management Team for review on February 21, 2017.  (*Id.* at 134.)  On February 28, 2017, alternative treatment was recommended instead of a second epidural injection; the form documented that the "Reason" was set forth in "Comments BY STAFF: Labar, Dianna, LPN."  (*Id.*) The referenced comments by Labar are not in the record.  On May 5, 2017, the last entry documented "Alterative Treatment Accepted REASON: See Comments BY STAFF: Thude, Andreas."  (*Id.*)  The referenced comments by Thude are not in the record.

Meanwhile, on April 20, 2017, Mason submitted an Informal Complaint Resolution stating that he is constantly prescribed psychiatric medication for his chronic pain and that this medication makes him sick, depressed, and does not help the pain at all.  (Doc. 259-4 at 100.)  Mason wrote that on March 28, 2017, pain management specialist Dr. Page prescribed Ultram for Mason's pain, and Mason requested that he be given the medication prescribed by the specialist.  (*Id.*)  On May 4, 2017, a nurse responded to Mason's Informal Complaint Resolution and informed him that the healthcare provider discontinued Mason's prescription for Tramadol (Ultram) and if Mason continued to have pain to report to sick call with an HNR.  (*Id.* at 101.)  Mason never received the prescribed Ultram/Tramadol. (Doc. 301 ¶ 83.)

On May 7, 2017, Mason proceeded to the next step in the grievance process by filing an Inmate Grievance, in which he reiterated that specialist Dr. Page prescribed Ultram for pain and stated that he will not take any more psychiatric medication for his pain as it does not help, it has made him sick, and it has negatively affected his mental health.  (Doc. 259-

---

[17] The Consultation Request form shows that on April 20, 2017, the entry documenting that the "More Information Provided," with comments by Thude, was made at 12:14 p.m.  (Doc. 259-3 at 134.)  The April 20, 2017 medical record documenting Thude's cell front visit with Mason shows that this encounter started at 12:17 p.m. and ended at 12:20 p.m. (*Id.* at 136.)  Thus, it does not appear that the "more information provided" regarding the consult request was the information Thude gleaned from the cell front visit.

4 at 102.) Mason requested that he be provided with the Ultram medication prescribed by Dr. Page. (*Id.*)

On May 17, 2017, Mason saw Thude; Thude informed Mason that the second epidural steroid injection was not recommended because the first one did not provide any relief. (Doc. 259-3 at 150.) This same date, Thude submitted a consult request for on off-site clinic appointment with orthopedics—Dr. Waldrip. (*Id.* at 155.) The Consultation Request form shows that the consult request was referred to the Corizon Utilization Management Team for review on May 18, 2017, and on May 23, 2017, the request was authorized. (*Id.* at 156.)

On May 19, 2017, the FHA responded to Mason's May 7, 2017 Inmate Grievance and informed him that because Mason reported that the epidural injection was ineffective, the provider was going to use an alternative treatment plan. (Doc. 259-4 at 103.) The response further informed Mason that per ADC policy, clinical decisions and actions regarding treatment services were the sole responsibility of the healthcare professionals and Mason did not have the right to dictate his treatment. (*Id.*)

On May 19, 2017, Mason initiated this lawsuit. (Doc. 1.)

On May 27, 2017, Thude discontinued the medication duloxetine per Mason's request. (Doc. 259-5 at 38.)

On June 15, 2017, Mason saw Dr. Waldrip again. (Doc. 259-3 at 164.) Dr. Waldrip noted that Mason presented with neck pain on the left side, radiating to the shoulder, arm, and hand, and that the pain was throbbing, penetrating, and included numbness and tingling. (*Id.*) Dr. Waldrip performed an injection of Celestone (corticosteroid) and Marcaine and Xylocaine (anesthetic agents) at the C-5 to C-6 and a Celestone injection into the left shoulder. (*Id.*) The medical note documented that Mason had full range of motion in his shoulder after the procedure. (*Id.*). Dr. Waldrip recommended that Mason continue with his exercises on a routine daily basis and to follow-up as necessary. (*Id.* at 165.)

On June 20, 2017, Mason submitted an HNR requesting a follow-up visit with the

provider.  (Doc. 259-4 at 44.)

On November 1, 2017, Mason filed an Informal Complaint Resolution in which he stated that he has been diagnosed with bulging discs and spinal stenosis and the orthopedic surgeon, Dr. Waldrip, referred him to a pain management specialist—Dr. Page.  (Doc. 73 at 19.)  Mason wrote that Corizon has refused to comply with Dr. Page's prescriptions for a course of epidural injections and for Ultram/Tramadol.  (*Id.*)  Mason stated that he lives in extreme pain daily, and he demanded that he be provided adequate pain relief medication immediately.  (*Id.*)

There was no response to Mason's Informal Complaint Resolution.  (*Id.* at 20.)  Therefore, on November 22, 2017, Mason submitted an Inmate Grievance setting forth the same information and requesting that he be provided Ultram/Tramadol and adequate pain relief, and that medical staff cease prescribing psychiatric medications for pain.  (*Id.*)

On December 1, 2017, Mason filed a Motion for Preliminary Injunction.  (Doc. 73.)

On January 5, 2018, Mason submitted an HNR requesting to see the provider for chronic and unbearable neck pain.  (Doc. 259-5 at 45.)  Mason wrote that it had been three months since he saw the orthopedic surgeon and that, despite documentation in his medical record, he never said that the epidural steroid injection was ineffective, and he would like to complete the series of injections.  (*Id.*)

On January 31, 2018, Mason blacked out, and officers initiated an Incident Command System for a medical emergency.  (Doc. 169, Pl. Decl. ¶ 7.)  Mason's hands were both completely numb, he was sweating, and his blood pressure was 190/120.  (*Id.*)  He was diagnosed with hypertension and prescribed high-blood pressure medication.  (*Id.*)  Mason states that at this time, he was suffering severe sleep deprivation and anxiety due to extreme pain.  (*Id.*)

On February 5, 2018, Mason saw Dr. Itoro Elijah.  (Doc. 259-5 at 55.)  Mason reported having suffered neck pain since a 2015 assault, and Dr. Elijah documented that Mason stated that ibuprofen worked better than the other medications given to him and did not want to change to another NSAIDs because ibuprofen helps a little.  (*Id.*)  Mason

disputes that he ever reported that ibuprofen helps a little. (Doc. 301 ¶ 96.)  The medical record also documented that Mason asked to be taken off omeprazole and muscle rub, that the capsaicin cream does not work, and that he never said that the epidural injections did not work and he would like to complete the series of three injections. (Doc. 259-5 at 55.)

That same day, February 5, 2018, Dr. Elijah submitted a consult request for Mason to get a repeat cervical epidural injection; on the Consultation Request form, Dr. Elijah documented the prior MRI findings and noted that the last injection was in June 2017. (*Id.* at 53.)  The Consultation Request form shows that the request was referred to the Corizon Utilization Management Team on February 6, 2017. (*Id.* at 54.)  On February 13, 2018, a note was entered on the form stating, "Need More Information REASON: See Comments BY STAFF: Garner, Jennifer." (*Id.*)  The referenced comments by Garner are not in the record.

On February 14, 2018, Dr. Elijah saw Mason and conducted a physical exam in response to the "NMI[need more information]." (*Id.* at 61.)  Dr. Elijah documented Mason's descriptions of his pain, previous treatments, and her findings that included no obvious deformity but notable focal swelling to distal cervical vertebral region. (*Id.* at 61–62.)  Dr. Elijah wrote that she would "report exam findings on NMI." (*Id.* at 64.)  The Consultation Request form documents that on February 14, 2018, the request was again referred to the Corizon Utilization Management Team for review and then, the next day, an entry was made stating "Need More Information REASON: See Comments BY STAFF: Garner, Jennifer." (*Id.* at 54.)  The referenced comments by Garner are not in the record.

On February 15, 2018, a medical note was entered documenting a "provider review" by Dr. Patrick Hopkins. (*Id.* at 66.)  The medical note stated that the consult request for epidural steroid injections was cancelled until the provider could "meet with patient and get clarification [Utilization Management] is looking for." (*Id.*)  The Consultation Request form documents that on February 15, 2018, the request was cancelled for the reason "need additional information," and the form referenced comments by Dr. Hopkins. (*Id.* at 54.)

On February 20, 2018, Dr. Elijah entered a medical note to address the "NMI"

regarding the number of prior cervical epidural steroid injections and the subjective benefit from the injections. (*Id.* at 99.) Dr. Elijah wrote that Mason had undergone just one injection in the past, that he reported some relief from the injection, and that she would reorder the consult request and request two additional injections to complete the original series of three. (*Id.*)

That same day, Dr. Elijah submitted a new Consultation Request form, requesting that Mason be sent for completion of two epidural injections for chronic neck pain, and she noted the MRI results, Mason's treatment history and pain, and the findings from her focused exam. (*Id.* at 70.) The Consultation Request form shows that the request was referred to the Corizon Utilization Management Team for review the next day, and, on February 23, 2018, it was noted that "Alternative Treatment Recommended REASON: See Comments BY STAFF: Garner, Jennifer." (*Id.* at 71.) The referenced comments by Garner are not in the record.[18]

The Consultation Request form reflects that on February 25, 2018, more information was provided and to "See Comments BY STAFF: Elijah, Itoro, MD." (*Id.*) The referenced comments by Dr. Elijah are not in the record.[19] The next day, the request was again referred to the Corizon Utilization Management Team for review, and, on March 1, 2018, alternative treatment was again recommended, noting that the "REASON: See Comments BY STAFF: Johnson, Erica." (*Id.*) The referenced comments by Johnson are not in the

_____

[18] Defendants assert that on February 23, 2018, an alternative treatment plan was recommended based on notes stating that injections are not typically recommended when there is no improvement and that other forms of pain control and home exercise should be considered. (Doc. 259 ¶ 100.) But Defendants cite only to the subject Consultation Request form in support of this assertion, and the form does not contain these notes nor any explanation or reason for the alternative treatment; the form only references comments by Jennifer Garner for the reason, and those comments are not in the record. (*Id.*; *see* Doc. 259-5 at 70–71.)

[19] Defendants assert on February 25, 2018, Dr. Elijah responded to the alternative treatment plan based on notes that Mason stated that "he never said that injections did not help initially. Only that at the time of Orth re-eval, he was still having pain" and that Mason stated that "if injections did not help, he would not be requesting completion of recommended course." (Doc. 259 ¶ 101.) There is no record of these notes on the Consultation Request form, to which Defendants cite, nor anywhere else in the record. (*See id.*; Doc. 259-5 at 70–71.)

- 22 -

record.[20]

The Consultation Request form shows that on March 5, 2018, "Alternative Treatment Accepted REASON: See Comments BY STAFF: Elijah, Itoro, MD." (*Id.*) The referenced comments by Dr. Elijah are not in the record.

Defendants assert that on March 5, 2018, Dr. Elijah entered a note in response to the second alternative treatment plan stating "[N]o option to further refute. [Mason] repeatedly states that injections DID help. I'm not sure why comments keep repeating that injection did not assist with symptom management." (Doc. 259 ¶ 103.) Defendants cite to the Consultation Request form, but this note does not appear anywhere on the form. (*Id.*; Doc. 259-5 at 70–71.) But Mason does not dispute that Dr. Elijah tried to help him receive further injections and that she stated the injection did help him. (Doc. 301 ¶ 103.)

On March 26, 2018, Mason saw Dr. Elijah, who entered the following note in the medical record:

> Discuss ATP [alternative treatment plan] Ortho injections
>
> See ATP below. Please advise if you agree or disagree by 03/02/2018 [sic].
>
> the case has been reviewed and I agree with the atp. [i]f the patient did not receive any relief from previous injection it does not make sense to do this again. Since the pain is getting worse, I would suggest the CT with contrast to determine the current anatomy[.]

(Doc. 259-5 at 74.) The March 26, 2018 medical record documented that the plan was to order a CT scan. (*Id.* at 76.) Mason states that Dr. Elijah offered him two more psychiatric drugs for his pain, but he told her he would not take any more psychiatric medications. (Doc. 169, Pl. Decl. ¶ 8.)

That same day, Dr. Elijah submitted a Consultation Request form requesting a CT scan of the neck "per ATP recommendation." (Doc. 259-5 at 72.) On March 27, 2018, the

---

[20] Defendants assert that on March 1, 2018, an alternative treatment plan was recommended based on a note regarding why it did not make sense to do another injection. (Doc. 259 ¶ 102.) The asserted note is not on the Consultation Request form to which Defendants cite. (*Id.*; *see* Doc. 259-5 at 70–71.)

request was referred to the Corizon Utilization Management Team.  (*Id.* at 73.)

On April 10, 2018, the Court issued an Order addressing Mason's Motion for Preliminary Injunction, which sought specialist care. (Doc. 156, addressing Doc. 73.)  The Court found that there were serious questions as to whether Defendants' failure to provide treatment and medication prescribed by the pain management specialist was medically unacceptable, and the Court directed the parties to file supplemental briefing to indicate Mason's current status and the current treatment regimen.  (Doc. 156 at 11–15.)

Mason stated that at this time, his pain had become a constant aching, sharp, shooting, stabbing, tingling, and burning pain in his left arm and shoulder and the left side of his neck down to the middle of his back.  (Doc. 169, Pl. Decl. ¶ 4.)  He was suffering constant numbness in his neck, upper back, right thumb, and two right-hand fingers.  (*Id.*)  He had also developed a hump in his neck and upper back due to the extreme pain, which prevented him from maintaining an erect posture.  (*Id.*)  Mason stated that he had a visible bulge in his neck along his cervical spine, and whenever it was touched or bumped he experienced extreme pain.  (*Id.*)

On April 26, 2018, the March 26, 2018 consult request for a CT scan was authorized and scheduled; the Consultation Request form shows that the "Reason" for authorization was set forth in comments by Carol Dolan, but the referenced comments are not in the record.  (Doc. 259-5 at 73.)

Mason received a CT scan that same day—April 26, 2018.  (*Id.* at 78.)  The CT report, issued the following day, indicated no significant degenerative changes in the cervical spine and found cervical lymphadenopathy (enlargement of lymph nodes) and mild bilateral maxillary sinusitis (inflammation of sinuses).  (*Id.* at 78–79.)

On May 8, 2018, the Court issued an Order granting Mason's request for injunctive relief and directing Corizon to promptly schedule Mason to see pain management specialist Dr. Page, to provide the treatment and medication recommended or prescribed by Dr. Page, and to promptly schedule Mason to see Dr. Waldrip or another orthopedic specialist. (Doc. 193 at 11.)

On May 9, 2018, Thude completed a Consultation Request form for Mason to be assessed by Dr. Page; specifically, assessment for Ultram and epidural injections. (Doc. 259-4 at 51.) Thude wrote "prior to ATP please confer with Dr. Ladele and/or VP of UM." (*Id.*) The next day, the request was referred to the Corizon Utilization Management Team for review, and, on May 16, 2018, the request was authorized. (*Id.* at 51.) The Consultation Request form shows that the reason for the authorization is set forth in comments by Carol Dolan, but the referenced comments by Dolan are not in the record. (*Id.*)

On May 22, 2018, Mason saw NP Nicole Johnson for evaluation of neck pain. (Doc. 259-5 at 82.) Mason stated that his neck was messed up, and he reported chronic and increased neck pain. (*Id.*; Doc. 301 ¶ 110.) The results of the CT scan were reviewed, and Johnson examined Mason. (Doc. 259-5 at 82–83.) Johnson documented full active range of motion and normal flexion and extension. (*Id.* at 83.) Mason requested adequate pain medication, and stated that he felt hopeless. (Doc. 301 ¶ 110.) The plan of care was medication compliance (ibuprofen and high blood-pressure medication), assessment for adjustments to high blood-pressure medication, and follow up as needed. (Doc. 259-5 at 84–85.)

On June 8, 2018, Mason saw Dr. Waldrip for an off-site orthopedic consultation. (Doc. 259-4 at 49.)[21] Dr. Waldrip noted that Mason reported continued neck pain and that the 2016 MRI showed "HNP C-5-6" and that an up-to-date MRI is needed with follow up thereafter. (*Id.*)[22]

---

[21] Dr. Waldrip's findings and recommendation are included in the "Clinical Summary or Attached Report" section of a one-page "Corizon Authorization Letter" form, which provides information to the off-site provider regarding service and payment. (Doc. 259-4 at 49.) There is no separate detailed medical report from Dr. Waldrip for the June 8, 2018 visit. (*Compare* Doc. 259-3 at 164–166, detailed three-page medical record of the June 15, 2017 visit with Dr. Waldrip, generated by his office and electronically signed by Dr. Waldrip.)

[22] "HNP" refers to herniated nucleus pulposus, which is a condition where part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disc, resulting in back pain and nerve root irritation. *See Herniated nucleus pulposus*, *U.S. Nat'l Library of Medicine*, https://medlineplus.gov/ency

On June 17, 2018, NP Johnson completed a Consultation Request form for an MRI as recommended by Dr. Waldrip. (Doc. 259-4 at 104.) The Consultation Request form shows that the request was referred to the Corizon Utilization Management Team for review on June 18, 2018, and, on June 21, 2018, authorization was obtained. (*Id.*) The form documents that the reason for authorization is set forth in comments by Jennifer Garner, but the referenced comments by Garner are not in the record. (*Id.*)

On June 26, 2018, Mason saw Dr. Page for an offsite pain clinic consultation. (Doc. 259-4 at 54.) Mason reported throbbing, shooting, sharp pain that was worse with sitting; neck pain; and arm and shoulder symptoms. (*Id.*) Dr. Page documented that Mason's pain was "relieved by nothing" and worsened by stress, activity, pushing on area, and movement. (*Id.*) Dr. Page also wrote that Mason reported mixed results with his last injection and was seeking an orthopedic surgeon for evaluation for spine surgery. (*Id.*) Dr. Page documented that Mason became aggressive during the visit and demanded pain medication, so Dr. Page cancelled the visit due to Mason's behavior. (*Id.*) Mason states that he never became aggressive. (Doc. 301 ¶ 113; Doc. 240, Mason Decl. ¶ 3.) Rather, Mason avers that he begged for pain relief and that Dr. Page said he would lose his contract with Corizon if he prescribed medication and that he must leave medications up to the Corizon providers. (Doc. 301 ¶ 113: Doc. 240, Mason Decl. ¶ 3; Doc. 279 at 2.) In his sworn statement, Dr. Page stated that without further examination of Mason, he could not state whether additional injections were needed, but that if Mason still had neck pain, he may need additional injections. (Doc. 293-1 at 2.) Dr. Page further stated that "[p]ain medication is prescribed by providers at the correctional facility. They make the determination whether they are needed or not." (*Id.*)

On July 4, 2018, NP Johnson completed a Consultation Request Action form documenting that due to the cancellation of Mason's epidural steroid injection procedure, an attempt would be made for another off-site appointment. (Doc. 259-4 at 56.) Johnson avers that she called Dr. Page's office to inquire whether he would see Mason again, but

/imagepages /9700.htm (last visited March. 11, 2019).

Dr. Page stated he would not see him. (Doc. 224, Ex. C, Johnson Decl. ¶ 10 (Doc. 224-1 at 24).) Johnson states that she therefore submitted a request for Mason to see a different pain management specialist, Dr. Thomas E. Masters. (*Id.* 11¶¶ –12.) The Consultation Request from for the re-evaluation for pain management was completed by Johnson on July 12, 2018. (Doc. 259-4 at 58.) Defendants assert that the consult request was approved; however, the Consultation Request form does not indicate that any action was taken, i.e., referral to Corizon Utilization Management Team, authorization, etc. (*Id.*) Rather the form states "ACTION TAKEN: None." (*Id.*)

On July 17, 2017, an off-site cervical spine MRI was performed. (Doc. 259-4 at 106.) The MRI radiology report showed minimal levoscoliosis (spine curvature to the left); mild to moderate degenerative disc and facet hypertrophic changes, most severe at C5–C6 with moderate neural foraminal narrowing and spinal canal stenosis; and possible focal myelomalacia at cervical spinal cord level C5–C6. (*Id.* at 106–107.)

On July 23, 2018, Mason saw the new pain management specialist, Dr. Masters. (*Id.* at 61–62.) In the medical record for this encounter, Dr. Masters noted tenderness around the C4–C6 area and the T2–T4 area, and he recommended a serious of facet injections, occipital nerve blocks, and trigger point injections. (*Id.*) The medical record does not specify what medications were to be injected or whether the injections included a steroid. (*See id.*) Mason stated that Dr. Masters told him that he had arthritis, that bulging discs heal themselves, and that Mason should stretch—even though Mason previously completed a full course of physical therapy with no success. (Doc. 233, Pl. Decl. ¶¶ 3–4, 10.) Mason stated that Dr. Masters practices homeopathic medicine and wanted to inject Mason with Traumeel or Sarapin. (*Id.* ¶¶ 6, 8.)[23]

_____

[23] Traumeel is identified by the National Institute of Health website as an unapproved homeopathic product that has not been evaluated by the FDA for safety or efficacy. *See Traumeel RX, U.S. Nat'l Library of Med.*, http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=bcca68ac-9c2c-4ee4-9a0a-69c8fbcc1578 (last visited March 12, 2019). Sarapin is a plant extract, and the manufacturer's label information for Sarapin states that "this drug has not been found by FDA to be safe and effective, and this labeling has not been approved by FDA." *See Sarapin,* Rx *DrugLabels*, https://rxddruglabels.com/ lib/rx/rx-meds/sarapin/ (last visited March 12, 2019).

On August 23, 2018, Mason saw Dr. Waldrip for the planned follow up appointment. (Doc. 259-4 at 109.)[24] In his clinical summary, signed on August 23, 2018, Dr. Waldrip noted the MRI findings and documented a "plan to proceed [with] Mobi C disc replacement C-5-6 as out patient." (*Id.*) Mason averred that Dr. Waldrip informed him that surgery was scheduled for the last week of December. (Doc. 250, Pl. Decl. ¶ 2 (Doc. 250 at 31).)

The next day, August 24, 2018, NP Johnson completed a Consultation Request for Mason to follow up with the pain management specialist for facet injection and nerve blocks. (Doc. 259-4 at 88.) The Consultation Request form shows that this request was referred to the Corizon Utilization Management Team for review on August 27, 2018, and, on September 5, 2018, the request was authorized. (*Id.*)

On August 28, 2018, NP Johnson completed a Consultation Request form requesting Mason "to have mobi c disc replacement as per orthopedic consult Plus 1 post-op." (Doc. 259-4 at 90.) The form shows that on August 29, 2018, the request was referred to the Corizon Utilization Management Team for review, and that, on September 4, 2018, an alternative treatment plan was recommended instead of the disc replacement surgery. (*Id.*) The form documents that the reason for the alternative treatment plan is set forth in comments by Erica Johnson. (*Id.*) The referenced comments are documented on the Consultation Request Action form, which stated the following:

ATP per Dr. Stacy:

ATP: Nerve block and trigger point injections have been approved but not yet performed. The attached court order indicates that the patient must see the orthopedic specialist; however, does not appear to require proceeding

---

[24] Dr. Waldrip's findings and plan for surgery are included the "Clinical Summary or Attached Report" section of the one-page "Corizon Authorization Letter" form, which provides information to the offsite provider regarding service and payment. (Doc. 259-4 at 109.) There is no separate detailed medical report from Dr. Waldrip for the August 23, 2018 visit. (*Compare* Doc. 259-3 at 164–166, detailed three-page medical record of the June 15, 2017 visit with Dr. Waldrip, generated by his office and electronically signed by Dr. Waldrip.)

with any surgical options offered by the surgeon. It goes on to say that the order extends no further than to correct the harm with the least intrusive means necessary. Consider reassessment after nerve block and injections, and reserving surgical intervention for severe, uncontrolled pain or inability to carry out ADLs [activities of daily living] despite these less invasive measures.

(*Id.* at 92.)

On September 11, 2018, Mason saw Dr. Masters again to proceed with the trigger point injections. (Doc. 250, Pl. Decl. ¶ 3 (Doc. 250 at 31).) Mason averred that he brought with him to this appointment his medical records (which were attached to the briefing Corizon had recently filed), and Dr. Masters indicated that he had not seen these records and was unaware of Mason's relevant medical and treatment history. (*Id.*) According to Mason, after Dr. Masters reviewed the records, he advised Mason not to stretch and that the best course of treatment was to follow Dr. Waldrip's surgery plan. (*Id.* (Doc. 250 at 31–32).) Dr. Masters told Mason that he was not a candidate for nerve blocks, and Dr. Masters did not perform any injections. (*Id.*, Pl. Decl. ¶¶ 4, 6.)[25]

On October 31, 2018, Mason underwent an anterior discectomy with a Mobi-C disk replacement of level C5-C6. (Doc. 323-2 at 23.) Dr. Waldrip directed that Mason be placed in the infirmary for 48 hours, wear a cervical collar at all times, and return for a follow-up appointment on November 6, 2018. (*Id.* at 26, 30.) The discharge medication instructions directed Mason to take the following medications, for which printed prescriptions were provided: acetaminophen-hydrocodone (Norco), 1 tablet every 6 hours for pain for 7 days; and cephalexin 500 mg (Keflex, an antibiotic), 1 capsule 4 times a day for 7 days. (*Id.* at 28, 34–35.) On October 31, 2018, when Mason returned to the prison, a nurse ordered a cervical collar to "begin" on November 3, 2018. (*Id.* at 42.) Mason was not placed in the infirmary, and he not given the Norco or Keflex medications. (*Id.* at 45; Doc. 295.)

On November 1, 2018, an Incident Command System was initiated for a medical

---

[25] The medical record from Dr. Master's September 11, 2018 appointment with Mason is not in the record.

emergency when Mason was unable to move due to extreme pain. (Doc. 323-2 at 66.) At 7:00 a.m. on November 2, 2018, another Incident Command System was initiated when Mason reported that he could not sit or lay down due to pain, that the Tylenol 3 tablets provided to him were doing nothing for pain, and that he had not slept for 2 days since his surgery. (*Id.* at 73.) Mason was transported by emergency personnel to the hospital, where he was provided treatment and pain medications. (Doc. 323-3 at 11, 15, 31; Doc. 295.) The emergency room physician contacted Dr. Waldrip, who recommended ibuprofen 800 mg three times a day. (Doc. 323-3 at 18.) Mason was discharged the same day from the hospital with a prescription for ibuprofen 800 mg to be taken every 8 hours for 7 days. (*Id.* at 24, 30, 32.)

When Mason returned to the prison, he was wearing a cervical collar, and the nurse noted that he had a prescription for ibuprofen 800 mg. (*Id.* at 33, 37.) But Mason was given ibuprofen 600 mg three times a day. (*Id.* at 36, 42–43.)

On November 7, 2018, NP Johnson entered a drug prescription order for acetaminophen/codeine tablets 300 mg to be taken twice a day for 5 days, and the order was approved that same day. (*Id.* at 50.)

Mason saw Dr. Waldrip for his follow-up appointment on November 20, 2018. (*Id.* at 52.) Dr. Waldrip noted that Mason had no complaints of pain and that x-rays showed good position of disc replacement at C5-6. (*Id.*)[26]

On November 25, 2018, Mason submitted an HNR stating that he still had neck and upper back pain and would like to see the provider. (*Id.* at 59.) On December 17, 2018, NP Johnson completed a Consultation Request form for Mason to see the orthopedic specialist due to continued neck pain and numbness on left side. (*Id.* at 67.) The Consultation Request form shows that in response to this request, no action was taken. (*Id.* at 68.)

---

[26] Dr. Waldrip's notes are included the "Clinical Summary or Attached Report" section of the one-page "Corizon Authorization Letter" form, which provides information to the offsite provider regarding service and payment. (Doc. 323-3 at 52.) There is no separate detailed medical report from Dr. Waldrip for the November 20, 2018 visit.

Mason filed a declaration in March 2019 stating that his pain is now severe and affects his ability to sit, sleep, read, or write. (Doc. 342.)

## VI. Eighth Amendment Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt*, 865 F.2d at 200).

Even if deliberate indifference is shown, to support an Eighth Amendment claim,

the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep' t*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**VII.  Discussion**

**A.  Thude**

Mason did not move for summary judgment as to the claim against Thude in his Motion for Partial Summary Judgment; however, Defendants seek summary judgment as to this claim in their Cross-Motion for Summary Judgment.  (Docs. 239, 257.)

**1.  Serious Medical Need**

Defendants do not argue that Mason's condition does not constitute a serious medical need.  (*See* Doc. 257).  Mason has averred that he suffered, and continues to suffer, severe pain, and that it has affected his daily activities.  (Doc. 73, Pl. Decl. ¶¶ 12, 14–15; Doc. 342.)   The evidence shows that Mason's condition and pain have been worthy of treatment for years, including x-rays, MRIs, medications, physical therapy, injections, specialist referrals, and surgery.  This record supports the finding of a serious medical need; thus, Mason satisfies the objective prong of the deliberate indifference analysis.  *See McGuckin*, 974 F.2d at 1059–60.

**2.  Deliberate Indifference**

With respect to the second prong, a plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]"  *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted).  Then, the plaintiff must show: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference.  *Jett*, 439 F.3d at 1096.

**a.  Knowledge of Serious Medical Need**

A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious.  *Farmer*, 511 U.S. at 842.

Defendants do not argue that Thude was unaware of Mason's serious medical need. (*See* Doc. 257.) Thude's first involvement in Mason's care was a specialist referral made in January 2017, and Thude completed the Consultation Request form  that included a review of Mason's medical history, complaints of worsening neck pain, and his MRI results. (Doc. 259-2 at 184, 189.) The evidence shows that Thude was aware of Mason's serious medical need.

### b.  Response to Serious Medical Need

After showing that a defendant was subjectively aware of a serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown "by a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Jett*, 439 F.3d at 1096. A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference).

Defendants argue that Thude's decision not to prescribe Mason an alternative pain medication when he saw Mason for the first time on February 1, 2017, was based on his medical judgment that alternative pain medication was not clinically indicated at the time. (Doc. 257 at 16.) The medical record shows that at this encounter, Mason reported that his pain was severe, that he was unable to sleep due to the pain, and that all treatments had failed, and he showed signs of pain. (Doc. 259-3 at 16; Doc. 301 ¶ 62.) Despite this presentation, Thude did not provide any alternative treatment. (Doc. 259-3 at 17.) Such a complete failure to respond to a prisoner's pain and to treat a serious medical need

ordinarily would support a finding of deliberate indifference.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment implicated even in "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the prisoner's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the prisoner's] situation").  But in this case, Thude had already submitted a consult request for Mason to see a pain management specialist, and at the February 1, 2017 appointment he confirmed to Mason that the pain management consult had been requested.  (*Id.*; Doc. 259-2 at 189.)  Because Thude had already taken steps to refer Mason to a pain specialist, his failure to prescribe alternative pain medication at the February 1, 2017 encounter does not evidence deliberate indifference.  *Cf. Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (finding material factual dispute whether physician was deliberately indifferent to a prisoner's serious medical condition where the physician refused to refer the prisoner to a specialist and "doggedly persisted in a course of treatment known to be ineffective, behavior that we have recognized as a violation of the Eight Amendment").

The record also shows that the day after this appointment, Thude took further steps to address Mason's serious medical need when he submitted another consult request for a CT scan of Mason's neck pursuant to Dr. Waldrip's recommendation.  (Doc. 259-3 at 23, 28.)  Although this request was ultimately cancelled, and subsequent consult requests for alternative treatments were submitted and then rejected, the record supports that the repeated cancellations and denials were by Corizon directors and administrators, not Thude.  (*See id.* at 36–37, 54; Doc. 259-4 at 46; Doc. 259, Ex.  B, Thude Decl. ¶¶ 15, 17.)  When Thude saw Mason on February 21, 2017, he informed Mason that he would be getting an epidural steroid injection, and, a week later, Thude prescribed Mason baclofen as an alternative muscle relaxant to methocarbamol.  (Doc. 259-3 at 59, 71.)  These actions by Thude do not exhibit deliberate indifference.

When Thude saw Mason on April 4, 2017, Mason had just seen specialist Dr. Page, who not only recommended that Mason be prescribed Ultram/Tramadol—he started Mason on Ultram. (Doc. 259-3 at 92.) Failure to follow a specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (the plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation).

But instead of prescribing and continuing administration of Ultram/Tramadol, a narcotic pain medication, Thude prescribed duloxetine, a selective serotonin/ norepinephrine reuptake inhibitor medication. (Doc. 259-3 at 121, 123–124; *see* supra n.16.) In his declaration, Thude states that despite Dr. Page's recommendation, he made the decision not to prescribe Ultram/Tramadol for Mason because he was aware that Mason had been disciplined for possession of drugs and had refused a urine analysis and, therefore, he knew that Mason had a higher risk of drug abuse. (Doc. 259, Ex. A, Thude Decl. ¶ 23 (Doc. 259-1 at 9).) Thude states that many prisoners prescribed Tramadol will hoard their medication so that they can sell it on the yard; thus, it is prescribed sparingly for security purposes. (*Id.* ¶ 6.) Thude does not indicate how he knew that Mason had been disciplined for drug possession and for refusing a urine analysis, or when these alleged offenses occurred. Nor did Thude document that this was the basis for his decision to reject the specialist's recommendation; there is nothing in the contemporaneously made record regarding concerns about Mason's drug history or drug abuse. (*See* Doc. 259-3 at 121–

125.)  And there is no documentation that Thude considered the medical consequences of rejecting the specialist's recommendation and prescribing a completely different type of medication.  (*See id.*)  *See Sullivant v. Spectrum Med. Servs.*, CV 11-00119-M-JCL, 2013 WL 265992, at *7 (D. Mont. Jan. 23, 2013) (genuine issue of material fact whether the defendants acted with deliberate indifference where the only explanation for discontinuing the plaintiff's medications was that he was hoarding the medications; "[d]enial of medical care as a form of punishment is acting in deliberate indifference of medical needs if there is not some evidence that medical consequences were considered"); *Jacoby v. Cty. of Oneida N.Y.*, 9:05-CV-1254 (FJS/GJD), 2009 WL 2971537, at *3–*4, 12 (N.D.N.Y. Sept. 11, 2009) (the medical defendants' proffered reason for withholding the plaintiff's medications—that he was in possession of another inmate's medication—was not a solid basis for withholding medication, particularly given the defendants' knowledge of the plaintiff's mental health history); *cf. Macleod v. Onuoha*, 6:13-188-DCR, 2015 WL 632184, at *10–*11 (E.D. Ky. Feb. 13, 2015) (discontinuing narcotic medication was warranted where the plaintiff had been found hoarding over 100 morphine pills in his rectum and he had been repeatedly charged with and convicted of improperly possessing drug substances); *Sepulveda v. Harris*, 9:09-cv-1117 (MAD/GHL), 2011 WL 2689357, at *5 (N.D.N.Y. July 11, 2011) (it was reasonable to discontinue narcotic pain medications after the plaintiff tested positive for illicit opiates because it was considered unsafe to mix the pain medications with illicit narcotics).  In this instance, Thude's decision not to follow Dr. Page's treatment recommendation cannot be considered merely a difference of opinion between doctors because Thude is not a physician.  *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (difference of medical opinion generally does not establish deliberate indifference until the plaintiff can show that the course of treatment chosen was medically unacceptable under the circumstances).

Finally, as mentioned above, at their February 2017 encounter, when Mason exhibited signs of pain, Thude smiled and said he was not going to give Mason any other pain medication, and, thereafter, he did not give Mason the pain medication started by the

specialist.  (Doc. 301 ¶ 62.)  Viewing the facts in Mason's favor, Thude's statement and conduct exhibit a dismissive attitude toward Mason's pain needs, which is probative of deliberate indifference.  *See Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) (in Eighth Amendment conditions-of-confinement case, the prison officials' "sarcastic responses" to prisoner's complaints "help raise a dispute about . . . defendants' knowledge of the condition, and their refusal to take steps to prevent it"); *Franklin v. McCaughtry*, No. 02-C-618-C, 2004 WL 221982, at *11 (W.D. Wis. Feb. 3, 2004) ("[a]lthough a prison official's statements could be evidence of deliberate indifference, it is his conduct and not his speech that is most probative in showing that a defendant acted with reckless disregard for the inmate's health").

In short, Thude was aware of Mason's severe pain, aware that current medications were ineffective, and aware that the specialist had recommended and administered Ultram/ Tramadol.  The record shows that Thude nonetheless refused to prescribe Ultram/Tramadol and provided no explanation in the medical record for the refusal.  A reasonable jury could find that Thude's refusal to follow the specialist's treatment plan constituted deliberate indifference to Mason's serious medical need.

### c.    Harm Caused by the Deliberate Indifference

The final question in the analysis is whether Mason suffered harm as a result of Thude's deliberate indifference.  Defendants argue that Mason has failed to demonstrate harm cause by the indifference.  (Doc. 259 at 20–21.)  They contend that the evidence shows Mason admitted several times that ibuprofen was effective; that his range of motion improved after receiving a Celestone injection; and that he has not been diagnosed with an ulcer.  (*Id.* at 20.)  They further contend that even if harm could be shown, any such harm would have been lessened by Mason's own assumption of the risk and contributory acts as he refused to take prescribed medication and try other medications, he refused to answer questions and attend some medical appointments; he contradicted his prior statements regarding the efficacy of the cervical epidural in an attempt to dictate and manipulate his course of care; and his behavior was out of control at times.  (*Id.*)

- 37 -

Defendants do not cite any cases that apply an assumption-of-the-risk or contributory-acts theory in the context of an Eighth Amendment medical care claim. (*See id.*)  Regardless, whether Mason contributed to his own harm would be a factual question reserved for the jury.  This is not a situation where Mason refused all treatment; he only refused to take a certain type of medication that had proven to be ineffective for pain and had caused other harmful side effects, and he disputes that ibuprofen was ever effective.  The record shows that even though Mason continued to request ibuprofen refills, at the same time, he continued to complain of worsening pain.  Whether Mason presented contradictory statements regarding the efficacy of epidural steroid injections and whether his behavior was out of control at times are also disputed issues.

The record shows that following the April 4, 2017 appointment with Thude, Mason reported continued chronic and severe pain.  (*See, e.g.*, Doc. 259-3 at 136, 164; Doc. 259-5 at 46.)  Mason avers that he has suffered increased chronic pain, and that his pain has caused extreme sleep deprivation and affected his daily activities.  (Doc. 306, Mason Decl. ¶ 8.)  The Court must take as true Mason's sworn statements regarding his pain and symptoms.  *See S. Cal. Housing Rights Ctr.*, 426 F. Supp. 2d at 1070.  Mason's ongoing pain could be found to constitute harm sufficient to support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 103; *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action); *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (pain and extreme discomfort suffered by a prisoner due to a delay in surgery were sufficient to constitute harm in the deliberate indifference context), *overruled in part on other grounds by Peralta*, 744 F.3d 1076.

For the above reasons, summary judgment will be denied as to the claim against Thude.

**B.  Corizon**

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom

promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### 1. Constitutional Injury

Mason alleges that he suffered a constitutional injury as a result of Corizon's actions and inaction in response to his serious medical need, which he claims has resulted in unnecessary delays and denials of medical treatment. (Doc. 249 at 7–8.) Corizon maintains that the medical records prove that Mason has received appropriate medical care and treatment for his spinal disc bulges, including multiple medical appointments, responses to his HNRs, offsite consultations with specialists, numerous diagnostic tests, and multiple medications for his symptoms. (Doc. 257 at 14.)

A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference. *Ortiz*, 884 F.2d at 1314. Also, as stated, a failure to follow a treating specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell*, 763 F.3d at 1069 (denying summary judgment where prison officials ignored the treating specialists' recommendations and instead relied on opinions of the non-specialist and non-treating medical officials who made decisions based on policy); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).

The record reflects that Mason was sent to an orthopedic spine specialist, Dr. Waldrip, in January 2017, and thereafter a Consultation Request was submitted and authorized for Mason to see a pain management specialist as ordered by Dr. Waldrip, and Mason saw Dr. Page in March 2017.  (Doc. 259-2 at 153, 189–190.)  But starting in February 2017, when a Consultation Request was submitted for a CT scan (as ordered by the orthopedic spine specialist), the providers' consult requests for treatment entered a repetitive cycle of cancellations, resubmissions, requests for more information, and alternative treatment plan recommendations.  (*See* Doc. 259-3 at 28 (CT scan request), 36–37 (EMG request), 54–55 (neuro-surgery request), 133–134 (epidural injection request); Doc. 259-5 at 70–71 (second epidural injection request); Doc. 259-4 at 90 (surgery request).)  The record indicates that these cancellations and alternative treatment recommendations were made by non-treating Corizon medical directors or other unknown personnel, and there is no indication that any of these Corizon officials were orthopedic or pain management specialists.  (*See id.*)  The reasons for the cancellations and alterative treatment recommendations are referenced on the Consultations Request forms; however, those referenced records have not been submitted.  A reasonable jury could find that these decisions by non-treating and non-specialist officials not to follow the two specialists' recommendations were medically unacceptable.

The record shows that Mason did not see Dr. Page or Dr. Waldrip again until after the Court ordered Corizon to schedule him with the specialists.  (Doc. 193 at 11; Docs. 259-4 at 49, 54.)  Thereafter, Dr. Waldrip recommended surgery, but the consult request for the surgery was denied and an alternative treatment plan was recommended by an unknown, non-treating "Dr. Stacy" for the reason that the Court's Order only indicated that Mason must see the orthopedic specialist, and it did not require Corizon to proceed with any recommended surgical options.  (Doc. 259-4 at 92.)  This insistence to comply only with the technical requirements of the Court's Order and disregard the specialist's recommendation reflects a callous indifference to Mason's serious medical need and is probative of deliberate indifference.

Without explanation or any related Consultation Request form or other records, Mason had spinal surgery on October 31, 2018. (Doc. 323-2 at 23.) The records show, however, that after surgery, prison medical staff did not comply with the surgeon's discharge directions for infirmary placement, nor did they immediately provide Mason with the ordered cervical collar or the prescribed post-op medications. (*Id.* at 26, 28, 30, 34–35, 45; Doc. 323-3 at 36–37, 42–43; Doc. 295.) A reasonable jury could find that this failure to follow the surgeon's discharge and medication instructions constituted deliberate indifference to Mason's serious medical need.

The record shows that there were significant delays in obtaining tests and treatment recommended by the specialists, in some cases, more than a year. (*See* Doc. 259-2 at 101; Doc. 259-3 at 28; Doc. 259-5 at 78 (CT scan obtained 16 months after initial recommendation); Doc. 259-3 at 91–92; Doc. 259-4 at 54; Doc. 73 at 19 (over 1-year delay in returning to pain management specialist despite recommendation to return in 4 weeks).) The record also shows that Mason was never prescribed the Ultram medication first recommended and started by Dr. Page in March 2017. There is no dispute that since 2016, Mason has repeatedly complained of and reported severe, chronic, and worsening pain, with little to no relief from the ibuprofen prescribed to him. A reasonable jury could find that these delays and denials of specialist-recommended treatment have caused Mason to suffer harm. *See McGuckin*, 974 F.2d at 1060; *Jones*, 781 F.2d at 771.

In light of the above, there exists a genuine issue of material fact whether Mason suffered a constitutional injury, thereby satisfying the first prong under *Monell*.

### 2. Policy or Custom

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute

a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)). But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.* Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006)

Defendants argue generally that there is no evidence that any alleged "policies" purportedly implemented by it were the moving force behind Mason's claimed injury. (Doc. 257 at 16.) But in their briefing and supporting evidence, Defendants refer to "medical care guidelines" used by providers to determine if specialist-recommended treatment is approved or indicated. (Doc. 259 ¶ 132; Ex. A, Thude Decl. ¶ 31 (Doc. 259-1 at 13).) Defendants also repeatedly refer to "medical criteria" that must be met prior to authorization of off-site procedures and other treatment. (Doc. 259 ¶¶ 60, 67, 138; Ex. A, Thude Decl. ¶¶ 8, 17, 49.) Defendants did not submit the referenced medical care guidelines and medical criteria; however, the references suggest that there are policies governing the provision and authorization of specialist treatment and off-site procedures.

Defendants also argue that Corizon has not changed its policy regarding pain medication for prisoners; they assert that no such policy exists. (Doc. 257 at 15.) As mentioned above, at the initial March 2017 encounter, Dr. Page started Mason on Ultram/Tramadol and recommended that he take the medication twice a day. (Doc. 259-3 at 92.) Then, in November 2018, Dr. Page stated in his sworn statement that pain medication is prescribed by the prison providers and that those providers make the determination whether pain medication is needed. (Doc. 293-1 at 2.) Even though the Court specifically asked Dr. Page to set forth his medical opinion, based on his examination of Mason and the MRI results, whether the pain medication Ultram remained medically necessary, he declined to do so. (*Id.*; Doc. 292 at 2.) A reasonable jury could find that a change occurred between 2017 and 2018 regarding Dr. Page's ability to make the determination or even issue an opinion about whether pain medication is needed. At the very least, this conflicting evidence creates a triable issue of disputed fact about whether such a policy existed. And, as noted, Defendants' custom and practice may be inferred from a demonstrated pattern of behavior towards Mason. *See Oyenik*, 2017 WL 2628901, at *2. For purposes of Defendants' Cross-Motion, the inference can be made that a policy or custom existed which governed or limited a specialist's ability to prescribe medication.

Lastly, the Court notes that although at least four consult requests for specialist-recommended treatment or procedures were immediately authorized upon submission of Consultation Request forms in 2016 and January 2017; thereafter, at least seven consults requests were denied. (*See* Doc. 259-3 at 28, 36, 54, 134; Doc. 259-4 at 90; Doc. 259-5 at 54, 70–71.) In addition, there was the complete refusal to follow Dr. Page's recommendation for Ultram/Tramadol, and, after surgery, Mason was denied the post-op medications and cervical collar prescribed by Dr. Waldrip. The evidence shows that the delays resulting from denied consult requests and the denials of medication did not result from the actions of one or two rogue employees; rather, they occurred over time and involved numerous Corizon employees and officials. A reasonable jury could conclude that consult request denials of specialist-recommended treatment and denials of medication

were not the exception to the policy, but the rule, and thereby constituted a custom or practice of deliberate indifference.  *See Gibson v. County of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

In light of the above, there is a genuine issue of material fact as to whether Corizon had a policy or custom that governed specialist-recommended treatment and medications.

### 3.     Deliberately Indifferent Policy/Moving Force

Defendants do not directly address the remaining *Monell* elements.  Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood*, 900 F.2d at 1334, an ongoing policy or practice that denies or delays specialist-recommended treatment and medication for a serious medical need and thereby causes injury would constitute a deliberately indifferent policy.

To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation.  *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  The Court has already found a genuine issue of material fact whether there existed a policy or custom of denying or delaying specialist-prescribed medications and treatment.  An obvious consequence of such a policy or custom may be the denial and delay of constitutionally adequate medical care.  On this basis alone, the moving-force element is satisfied.  *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Accordingly, Defendants fail to show the absence of a genuine issue of material fact as to whether Corizon has a deliberately indifferent policy that caused Mason to suffer a constitutional violation, and their Cross-Motion for Summary Judgment will be denied. These disputes of material fact also preclude summary judgment for Mason as to his claim against Corizon, and his Motion for Partial Summary Judgment will be denied.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Mason's Motion for Partial Summary Judgement (Doc. 239), Defendants' Cross-Motion for Summary Judgment (Doc. 257), and Mason's Motion to Compel (310.)

(2)     Mason's Motion to Compel (Doc. 310) is **denied**.

(3)     Mason's Motion for Partial Summary Judgment (Doc. 239) is **denied**.

(4)     Defendants' Cross-Motion for Summary Judgment (Doc. 257) is **denied**.

Dated this 27th day of March, 2019.


David G. Campbell
Senior United States District Judge