**WO**

JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nathan Sterling Mason, | No. CV17-8098-PCT-DGC (MHB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Nathan Sterling Mason brought this civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Director Charles L. Ryan; Correctional Officer Joshua Baese; Corizon, LLC; and Nurse Practitioner Andreas Thude. (Doc. 46.) Mason alleged several Eighth Amendment claims, including that he was subjected to a threat to his safety and denied adequate medical care for injuries he suffered after an attack by other inmates. (*Id.*) On April 2, 2019, the Court appointed counsel to represent Mason. (Doc. 372.) Pending before the Court is Mason's Motion for Preliminary Injunction, which relates to medical care. (Doc. 303.) Corizon and Thude (Defendants) responded. (Doc. 323.) The Court will deny the Motion.

**I.     Background**

In his First Amended Complaint, Mason alleged that in December 2015, he suffered a neck injury, and his C5-C6 discs bulged through his spinal canal, causing extreme and chronic pain and medical problems. (Doc. 46 at 3.) On October 31, 2018, Mason underwent Mobi-C disc replacement surgery. (Doc. 303 at 1.) In his Motion for

Preliminary Injunction, Mason seeks an order directing Defendants to send him back to the orthopedic surgeon for follow-up, to provide specialist-recommended pain medication, and to provide him with a medical wedge and medical mattress. (*Id.*)

**II.     Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits' – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" version of the sliding-scale test, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted). The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison

officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction). A court may also consider evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Camenisch*, 451 U.S. at 395.

**III. Relevant Facts**

On October 31, 2018, Mason underwent an outpatient, anterior discectomy with a Mobi-C disk replacement of level C5-C6. (Doc. 323-2 at 23, 27.) The orthopedic surgeon, Dr. Waldrip, ordered that Mason be placed in the infirmary for 48 hours, wear a cervical collar at all times, and return for a follow-up appointment on November 6, 2018. (*Id.* at 26, 30.) The discharge medication instructions directed Mason to take the following medications, for which printed prescriptions were provided: acetaminophen-hydrocodone

(Norco), 1 tablet every 6 hours as needed for pain for 7 days; and cephalexin 500 mg (Keflex, an antibiotic), 1 capsule 4 times a day for 7 days. (*Id.* at 28, 34–35.) Dr. Waldrip directed that in addition to the new prescriptions, Mason should continue taking ibuprofen, 600 mg 3 times a day, and amlodipine and lisinopril (high blood pressure medications) once a day. (*Id.* at 29.)

On October 31, 2018, when Mason returned to the prison, he saw Nurse Reginald Harrell, who documented that Mason denied any numbness or tingling and agreed to notify staff with any problems or concerns. (*Id.* at 36–37, 40.) Mason was not placed in the infirmary. (*Id.* at 45; Doc. 295.) Nor was Mason given the Norco or Keflex medications as prescribed. (*Id.*) Instead, he was prescribed Tylenol #3 tablets, 300 mg twice a day for seven days, and Keflex, 500 mg just once a day. (Doc. 323-2 at 47–48, 50, 56.)

On his first night back from the hospital, Mason tried to lay flat on his bed but was paralyzed with pain; he began shaking and experienced labored breathing, which prevented him from being able to call for help. (Doc. 298, Mason Decl. ¶ 6.) When Mason's cellmate woke up, the cellmate called for help for hours, but there was no response. (*Id.* ¶ 7.) Mason's cellmate helped lift Mason up to a seated position, where Mason stayed until the cell doors were opened for breakfast, at which time he slowly made his way out to contact corrections officers. (*Id.* ¶¶ 8–9, 11–12.) The officers initiated an Incident Command System for a medical emergency because Mason was unable to move due to extreme pain. (Doc. 323-2 at 66.) Medical staff responded after approximately 30 minutes. (Doc. 298, Mason Decl. ¶ 12.) Mason told medical staff that he could not sit or lay down, so he was told to stand. (*Id.*) The medical record documented that Mason was prescribed bed rest and "lay in" for 7 days with meals in his room. (Doc. 323-2 at 70.)

The next day, just before 6:00 a.m., a second Incident Command System was initiated when Mason reported that he could not sit or lay down due to pain, that the Tylenol #3 tablets provided to him were doing nothing for pain, and that he had not slept for two days since his surgery. (*Id.* at 73.) The responding nurse was unable to do an assessment because Mason refused to be touched and wanted to go to the medical unit to see the

provider. (*Id.* at 74.) Mason was administered a Toradol injection for pain, and a prescription for Methocarbamol (muscle relaxant) was issued. (Doc. 323-3 at 4.)

About an hour later, at 7:00 a.m., Mason was brought to the medical unit for an assessment; he reported constant, throbbing pain since his surgery, and stated that he had not sat or laid down for two days due to pain. (*Id.* at 11.) Mason was transported by emergency personnel to the hospital, where he was provided treatment and pain medications, including Norco, morphine, antibiotics, and another Toradol injection, after which Mason reported that he felt much better. (*Id.* at 11, 15, 17–18, 31; Doc. 295.) An x-ray was taken of his cervical spine and it showed no hardware deformity. (Doc. 323-3 at 18.) The emergency room physician contacted Dr. Waldrip, who recommended increasing ibuprofen to 800 mg three times a day. (*Id.*)[1] Mason was discharged the same day from the hospital with a prescription for ibuprofen 800 mg to be taken every eight hours for seven days. (*Id.* at 24, 30, 32.) When Mason returned to the prison around 4:30 p.m., he was given ibuprofen 600 mg three times a day. (*Id.* at 36, 42–43.)

On November 5, 2018, Mason saw Nurse Practitioner (NP) Nicole Johnson. (Doc. 23-3 at 39.) Johnson documented that Mason reported he was feeling much better and he could sleep without pain. (*Id.*) But Mason avers that at this appointment, he informed Johnson that he could not sleep or sit in any position without pain, and he requested a medical mattress and medical wedge to support his spine. (Doc. 298, Mason Decl. ¶ 19.) Johnson documented that hospital records were reviewed, and that Mason was to follow up with Dr. Waldrip, but there was "no recommendation of when, only states f/u [follow-up] for scheduled appointment." (Doc. 323-3 at 43.) Johnson also documented "800 mg of Ibuprofen every 8 hours—d/t [due to] formulary will have ibuprofen 600 mg every 8 hours[.]" (*Id.*) On November 7, 2018, NP Johnson entered a drug prescription re-fill order for Tylenol #3, 300 mg two tablets twice a day. (*Id.* at 50.)

---

[1] As stated, although Dr. Waldrip prescribed Norco every six hours and Keflex four times a day, Mason was never provided the Norco and was given Keflex just once a day. However, the emergency room records document that Mason's prescribed medications were Norco every six hours and Keflex four times a day. (Doc. 323-3 at 17.)

- 5 -

On November 20, 2018, Mason saw Dr. Waldrip for his follow-up appointment. (*Id.* at 52.) Dr. Waldrip noted that Mason had no complaints of pain, that x-rays showed good position of the disc replacement at C5-6, and to follow up if necessary. (*Id.*)[2]

On November 25, 2018, Mason submitted a Health Needs Request (HNR) stating that he still had neck and upper back pain and needed to see the provider. (*Id.* at 59.) On December 6, 2018, in response to the HNR, Mason was seen in the medical unit by a nurse, who documented that Mason stated he would like to refuse the appointment after he learned that he would be charged for the appointment. (*Id.* at 60–61.)

On December 17, 2018, NP Johnson completed a Consultation Request form for Mason to see the orthopedic specialist due to continued neck pain and complaints of numbness on his left side and feeling "like [his] spine is breaking his half," and for a plan of care and pain management after surgery. (*Id.* at 67.) That same day, the consultation request was referred to the Corizon Utilization Management Team for review. (Doc. 327-1 at 2.) On December 19, 2018, the Corizon Utilization Management Team ordered an alternative treatment plan in lieu of an appointment with the orthopedic specialist. (*Id.* at 3.) The explanation for the alternative treatment plan stated:

> Records indicate that the patient was evaluated by the surgeon after complaints of severe post-surgical pain began. However, the handwritten surgeon's note indicates "no complaints of pain." Consider obtaining the surgeon's full post-op visit note, or contacting the surgeon for additional information. As the patient was recently evaluated, another follow-up may not be medically necessary.

(*Id.*)

A month later, on January 29, 2019, NP Johnson entered a medical note documenting that on this date, she contacted Dr. Waldrip and notified him of Mason's complaints of pain, and Dr. Waldrip told her he wanted to see Mason for evaluation and plan of care. (*Id.* at 5.) Johnson wrote that "TW" would place a consult request and an

---

[2] Dr. Waldrip's notes are included in the "Clinical Summary or Attached Report" section of the one-page "Corizon Authorization Letter" form, which provides information to the offsite provider regarding service and payment. (Doc. 323-3 at 52.) There is no separate medical record from Dr. Waldrip's office for the November 20, 2018 visit.

- 6 -

order for cervical x-ray for Dr. Waldrip. (*Id.*) An x-ray order was issued that same day. (*Id.* at 10.) Also, on January 29, 2019, Johnson completed a Consultation Request form for an offsite appointment with Dr. Waldrip. (*Id.* at 12.) On January 30, 2019, Mason was transferred to the Lewis Barchey Unit. (Doc. 328.)

On February 6, 2019, Mason was seen in the medical unit by Dr. Kelly McElroy. (Doc. 332, Pl. Decl.) Dr. McElroy issued a lower bunk order due to Mason's medical condition; she documented that Mason's "medical condition has worsened and awaiting input from surgeon – major damage and permanent disability possible if [inmate] falls[.]" (Doc. 333 at 5.)

On March 6, 2019, Mason filed a declaration stating that the week prior, he saw Dr. Waldrip. (Doc. 339, Mason Decl.) At that appointment, Dr. Waldrip informed Mason that his upper back was not yet serious enough for a second surgery. Dr. Waldrip administered a steroid injection and advised Mason to see him again if the pain persisted. (*Id.*)

On March 11, 2019, Mason filed a declaration stating that his pain was so severe it affected his ability to sit, sleep, read, or write. (Doc. 342, Mason Decl.) Mason attached a copy of an informal grievance he submitted on December 14, 2018, stating that he was in excruciating pain and could not sit or sleep, that ibuprofen was not effective, that he would not take psychiatric medications, and requesting adequate pain medication. (*Id.*, Attach.) Mason stated that he did not receive a response at the time. (*Id.*) But then, in March 2019, he received a response stating that Corizon considered the grievance a "duplicate" informal that would be disregarded. (*Id.*) The response told Mason that duplicate informals for the same issue are not permitted and the "matter [was] considered closed." (*Id.*) Mason submits that because Corizon refused to respond to requests for adequate treatment, he does not know how to get assistance for his medical needs. (*Id.*)

On April 1, 2019, Mason filed a declaration stating that he has severe pain in his upper back, shoulder, and neck, and that he has not received his high blood pressure medication for over a week, despite a prescription that is good for months. (Doc. 366, Mason Decl.) He further states that Corizon has not placed a provider at the Barchey Unit

- 7 -

and has told him and other prisoners that they must wait until the new company comes. (*Id.*)

**IV. Discussion**

**A. Likelihood of Success/Serious Questions**

To establish a likelihood of success on the merits of an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference may be established where a prisoner shows that doctors chose a course of treatment that was "medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see Jett*, 439 F.3d at 1097-98 (jury could find deliberate indifference where the prison doctor was aware that the plaintiff needed to see an orthopedist for treatment and the plaintiff was not taken to the orthopedist for six months).

The Ninth Circuit has held that failure to follow a specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *see also Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the

prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

The Court previously analyzed Mason's likelihood of success on the merits of his medical care claim and determined that there were serious questions about whether Defendants' failure to provide the treatment and medication prescribed by the treating specialist was medically unacceptable and, therefore, Mason satisfied the first *Winter* factor. (Doc. 156 at 13.) *See Alliance for the Wild Rockies*, 632 F.3d at 1135; *see also Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits") (internal quotation omitted). That analysis focused on Defendants' failure to provide treatment and medication prescribed by the treating pain management specialist, Dr. Page. (*See* Docs. 73, 156, 193.) At issue in Mason's pending Motion for Preliminary Injunction is Defendants' alleged failure to provide treatment and medication prescribed by the treating orthopedic surgeon, Dr. Waldrip. (Doc. 303.)

The evidence shows that Dr. Waldrip expressly ordered that, post-surgery, Mason be housed in the infirmary for 48 hours. (Doc. 323-2 at 26.) Defendants concede that Mason was not placed in the infirmary. In his declaration, Dr. Ayodeji Ladele, Corizon's Regional Medical Director, avers that Corizon could not comply with Dr. Waldrip's directive because there were no infirmary beds available at the time. (Doc. 323, Ex. A,

1  Ladele Decl. ¶¶ 2, 10.) But no contemporaneous record documents an unavailability of
2  infirmary beds at the time, nor that any effort was made to secure an infirmary bed at the
3  Lewis or other ADC Complex. Dr. Ladele does not refer to or attach any documentation
4  showing the number of prisoners housed in the infirmary during the relevant time. Even
5  assuming no infirmary beds were available, no evidence shows that Defendants took any
6  measures to ensure that Mason still received adequate post-surgical care, such as
7  temporarily housing him close to the medical unit or scheduling frequent visits by medical
8  staff to his cell for the first 48 hours after his return. The evidence shows that the only time
9  medical staff went to Mason's cell in the 48 hours after his return from the hospital was in
10 response to emergencies initiated via the Incident Command System. (Doc. 323-2
11 at 66, 73.)

   Corizon's medical staff failed to follow orders from the treating surgeon and failed to take reasonable measures to abate a known risk of serious harm to Mason's health. *See Farmer*, 511 U.S. at 847 ("deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Colwell*, 763 F.3d at 1069. Corizon asserts that no evidence shows Mason was harmed from not being housing in the infirmary. (Doc. 323 at 4.) But the record shows that Mason suffered severe and paralyzing pain his first night back from surgery; he was unable call for help from his cell for hours; and when he could finally contact officers, an emergency Incident Command System was initiated, and medical staff failed to respond for 30 minutes. The following morning, Mason required emergency transport to the hospital for treatment. The record supports that Mason suffered harm as a result of not having access to medical staff.

   The evidence includes multiple medical records and discharge directions in which Dr. Waldrip ordered Mason to take Norco, four times a day as needed for pain for seven days, and Keflex, four times a day for seven days. (Doc. 323-2 at 28, 34–35.) The discharge papers included "Medication Instructions" that directed Mason to start taking the Norco and Keflex as ordered by Dr. Waldrip. (*Id.* at 28.) The discharge papers included a

second page listing his printed prescriptions for Norco and Keflex and the prescribed dosages. (*Id.* at 29.) The records also document that before being discharged, Mason was educated about taking Norco, an opioid, and the necessity of taking the medication only as prescribed. (*Id.* at 32–33.) Defendants acknowledge that Mason was not provided the Norco medication when he returned to the prison and was instead prescribed Tylenol #3. Dr. Ladele avers that Vicodin was not prescribed because it is highly addictive, widely abused among prisoners, not intended for long term use, and it was a non-formulary drug that required a special order from an offsite pharmacy. (Doc. 323 at 4–5.)[3] Dr. Ladele confirms that he has not treated Mason and is not familiar with Mason, and that his declaration is based on a review of Mason's medical records. (Doc. 323, Ex. A, Ladele Decl. 3–4.) But none of the reasons Dr. Ladele articulated for the refusal to provide Norco are documented in Mason's medical records, nor did Dr. Ladele attach to his declaration a copy of the available formulary drugs. (*See id.*) Regardless, Dr. Waldrip only prescribed Norco to be taken for seven days, and the records show that Mason was administered his medications each day by medical staff. Thus, the concerns raised by Dr. Ladele about long term use of the drug and abuse among prisoners appear unfounded and unlikely to occur.

The only note in the medical records related to the provision of Tylenol #3 instead of Norco is documentation by Nurse Harrell on October 31, 2018 that "Orders changed as [patient] to get T3 tabs, order placed incorrectly. New orders placed." (Doc. 323-2 at 43, 47.) The medical records show that the change to Tylenol #3 was pursuant to a "Nurse Override" approved by NP Johnson. (*Id.* at 48.) Defendants point to the Norco prescription form signed by Dr. Waldrip, which included the words "Substitution Permitted" under Dr. Waldrip's signature, to argue that Dr. Waldrip expressly permitted such a substitution. (*Id.* at 5; Doc. 323-2 at 35.) But the substitution approved by Johnson was not a generic substitution; rather, it was a different medication with different ingredients. Moreover, the

---

[3] Norco and Vicodin are two different brand names of hydrocodone combination products and both contain acetaminophen and hydrocodone. *See Hydrocodone Combination Products*, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601006.html (last visited April 4, 2019).

- 11 -

evidence shows that a nurse or nurse practitioner overrode and changed the orthopedic specialist's orders for medication. And there is no record that Dr. Waldrip was notified or asked about the change in prescribed medication before it was administered to Mason. As to the Keflex, Defendants state that it is unclear why Mason was provided a 75% reduced dose of the medication. (Doc. 323 at 5.) Corizon maintains, however, that no evidence shows Mason was harmed as a result of the change from Norco to Tylenol #3 or the lower dose of Keflex. (*Id.* at 5–6.) Mason did not incur a post-surgical infection, which the Keflex was prescribed to prevent. But the evidence shows that that the Tylenol #3 was ineffective for pain, and that two days after surgery, Mason was taken to the hospital for severe pain. Further, the record documents that when Mason went to the emergency room, Dr. Waldrip recommended increasing the ibuprofen to 800 mg, but thereafter the prison medical staff provided just 600 mg without explanation for the reduced dosage and despite Mason's continued severe pain. The record supports that Mason suffered harm from the non-specialists and non-physicians' failure to follow the prescription orders by the treating specialist.

Finally, the record documents that Dr. Waldrip ordered Mason to return to his office for follow-up on November 6, 2018. This specific date for a follow-up appointment appears in both the Corizon Authorization Letter setting forth Dr. Waldrip's clinical summary and the discharge "Followup Care Information." (*Id.* at 26, 30.) After the surgery, Dr. Waldrip told Mason that he was supposed to return in one week for follow up. (Doc. 298, Mason Decl. ¶ 20.) The emergency room physician, Dr. Scott, documented in his November 2, 2018 medical note that he consulted with Dr. Waldrip, who recommended that Mason "follow up as previously determined"; therefore, Dr. Scott wrote in the "Plan notes" that Mason was to follow up with Dr. Waldrip at his scheduled appointment. (Doc. 323-3 at 19.) Corizon acknowledges that Mason did not see Dr. Waldrip for his post-operative follow-up appointment until November 20, 2018. (Doc. 323 at 9.)[4] Corizon

---

[4] Corizon claims that it attempted to schedule the follow-up appointment, but Dr. Waldrip's office was unable to accommodate. But this claim is entirely unsupported.

argues, however, that the delay in seeing Dr. Waldrip caused Mason no harm as evidenced by Dr. Waldrip's note that Mason reported no pain and x-rays showed the C5-C6 disc in place. (*Id.*) But Corizon did not submit Dr. Waldrip's medical record for the November 20, 2018 appointment, and his complete findings are unknown. Moreover, as noted, in the days after Mason's surgery and at the time he was supposed to have seen Dr. Waldrip, Corizon had changed the medication prescribed by Dr. Waldrip. Mason was then taken to the hospital for emergency treatment and was suffering severe pain, and he continued to report severe pain thereafter. This evidence supports that Mason suffered harm as a result of the delay in seeing Dr. Waldrip.

In sum, the evidence documenting Mason's medical care since his October 31, 2018 neck surgery, Corizon's failures to follow the treating specialist's prescribed treatment, and Mason's condition and ongoing pain all support Mason's claim that Corizon has acted with deliberate indifference to his serious medical needs. Mason has demonstrated a likelihood of success on the merits, and he satisfies the first *Winter* factor.

### B. Remaining *Winter* Factors

In its Order granting Mason's prior request for injunctive relief related to medical care, the Court analyzed and rejected the same arguments Corizon presents in its current briefing regarding the balance-of-hardships and public-interest factors. Namely, that the Court should not interfere in prison operations or override the decisions of correctional authorities. (*See* Doc. 323 at 14–15; Doc. 102 at 14–16; Doc. 193 at 7–9.) Here, for the same reasons, the Court finds that the balance of equities tips in Mason's favor, and it is in the public interest to prevent suffering during the course of this lawsuit. (*See* Doc. 193 at 7–9.)

---

(Doc. 323 at 9.) Corizon relies on Dr. Ladele's averments that on November 2, 2018, Corizon called Dr. Waldrip's office and left a voicemail message but no one called back, so then, on November 5, 2018, Corizon called again and Dr. Waldrip's office scheduled the appointment for November 20, 2018. (Doc. 323, Ex. A, Ladele Decl. ¶¶ 15, 18.) Dr. Ladele does not identify who made these phone calls, and, again, his declaration is based on a review of the medical records. He does not cite to any record to support his statements. (*Id.* ¶¶ 4, 7.) The Court finds no record or documentation of any phone calls made to Dr. Waldrip's office on these or other dates and no record of attempts to set up a follow-up appointment for Mason. (*See* Docs. 323-2 & 323-3, med. records.)

But Mason's Motion for Preliminary Injunction fails on the irreparable injury element. A plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th 1988) (speculative injury is not irreparable injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22. "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). In his pending Motion for Preliminary Injunction, Mason requested an order directing that Corizon bring him to see Dr. Waldrip. (Doc. 303.) Since filing his Motion, Mason has seen Dr. Waldrip twice – first on November 20, 2018, and again in late February or early March 2019. Thus, Mason has already received his requested relief.

Mason further requested that Corizon provide the medications prescribed by Dr. Waldrip. The record shows that Corizon did not provide the medications recommended post-operatively; but those medications were to be dispensed for seven days only. Because Corizon did not provide Dr. Waldrip's medical records from the November 2018 and the February and March 2019 appointments, it is unknown whether Dr. Waldrip recommended additional medications for Mason. In his supplemental declarations, Mason does not identify any specific medication that Dr. Waldrip recommended or prescribed at these two appointments which Corizon has failed to provide. Without specific facts on this issue, Mason has not shown that Corizon is presently refusing to provide specialist-recommended medication and subjecting Mason to an imminent risk of harm.

Similarly, without the medical records, it is unknown whether Dr. Waldrip recommended a medical wedge and medical mattress. Corizon asserts there was no such recommendation, and Mason does not directly refute this assertion. (Doc. 323 at 12.) Again, absent specific facts going to this issue, Mason cannot demonstrate that Corizon is presently refusing to provide specialist-recommended medical equipment and subjecting Mason to imminent harm as a result.

To be sure, the Court takes seriously Mason's claims of ongoing pain, and pain can constitute irreparable harm. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed or complete lack of necessary treatment, and increased pain); *McNearney*, 2012 WL 3545267, at *14 (finding a likelihood of irreparable injury where the plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to the defendants' inadequate treatment plan). But in light of Mason's averment that he saw Dr. Waldrip at the end of February or the beginning of March 2019, and absent medical evidence or specific facts showing that Corizon is currently refusing to provide medication, treatment, or equipment recommended by Dr. Waldrip at that appointment, Mason cannot show a presently existing threat of harm. The Court will therefore deny his Motion for Preliminary Injunction without prejudice.

**IT IS ORDERED** that the reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Motion for Preliminary Injunction (Doc. 303), and the Motion is **denied**.

Dated this 24th day of April, 2019.

*David G. Campbell*
David G. Campbell
Senior United States District Judge